IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE

AT KNOXVILLE

AUGUST 1997 SESSION



FILED

March 17, 1998

Cecil Crowson, Jr.
Appellate Court Clerk

| | | |
|---|---|---|
| JEFFREY STUART DICKS, | ) | No. 03C01-9606-CC-00231 |
| | ) | |
| Appellant | ) | |
| | ) | GREENE COUNTY |
| V. | ) | |
| | ) | HON. WILLIAM H. INMAN, |
| STATE OF TENNESSEE, | ) | JUDGE |
| | ) | |
| Appellee. | ) | (Post-Conviction - Death Penalty) |
| | ) | |
| | ) | |

For the Appellant:

Greg W. Eichelman
District Public Defender

D. Clifton Barnes
Assistant Public Defender
1609 College Park Drive
Box 11
Morristown, TN 37813

For the Appellee:

John Knox Walkup
Attorney General and Reporter

Amy L. Tarkington
Assistant Attorney General
450 James Robertson Parkway
Nashville, TN 37243-0493

H. Greeley Wells, Jr.
District Attorney General
P.O. Box 526
Blountville, TN 37617

OPINION FILED: _____

AFFIRMED

WILLIAM M. BARKER, JUDGE

**OPINION**

In this capital case, the appellant, Jeffrey Stuart Dicks, appeals as of right the Greene County Criminal Court's dismissal of his fourth and fifth petitions for post-conviction relief. The issues on appeal may be summarized as follows:

(1) Whether the case should be remanded to the trial court for a new evidentiary hearing;

(2) Whether the application of the felony-murder aggravating circumstance was harmless beyond a reasonable doubt; and

(3) Whether the jury instructions on mitigating circumstances violated appellant's federal constitutional rights under the Eighth and Fourteenth Amendments.

After a thorough review of the record, we find no error requiring a reversal of appellant's death sentence. Accordingly, we affirm the trial court's denial of post-conviction relief.

**I. PROCEDURAL HISTORY**

The appellant was convicted in 1979 of the felony murder of James Keegan, the elderly shopkeeper of the Budget Shop in Sullivan County, Tennessee.[1] The jury sentenced appellant to death upon finding two aggravating circumstances: (1) the murder was especially heinous, atrocious, or cruel; and (2) the murder was committed during the perpetration of a felony. See Tenn. Code Ann. §§ 39-2404(I)(5), (7) (Supp. 1978).[2] Appellant's conviction and sentence were affirmed on direct appeal to our supreme court. State v. Dicks, 615 S.W.2d 126 (Tenn. 1981), cert. denied 454 U.S. 933, 102 S.Ct. 431, 70 L.Ed.2d 240 (1981).

Appellant filed his first petition for post-conviction relief in 1982 alleging ineffective assistance of counsel. The trial court denied relief and that ruling was affirmed by this Court. See Jeffrey Stuart Dicks v. State, No. 201 (Tenn. Crim. App. at

---

[1]Before appellant's trial, a change of venue was granted by the trial court to Greene County. As a result, appellant's conviction originated in Greene County, which is the proper venue for appellant's post-conviction proceedings. See Tenn. Code Ann. §40-30-103(a)(1) (repealed 1995).

[2]Appellant's co-defendant, Donald Wayne Strouth, was convicted of felony murder and sentenced to death in an earlier trial. See State v. Strouth, 620 S.W.2d 467 (Tenn. 1981), cert. denied 455 U.S. 983, 102 S.Ct. 1491, 71 L.Ed.2d 692 (1982).

Knoxville, January 20, 1984), perm. app. denied (Tenn. April 30, 1984). Similarly, appellant's second post-conviction petition, filed in 1986, was denied by the trial court, and that ruling was upheld on appeal. See Jeffrey Stuart Dicks v. State, No. 275 (Tenn. Crim. App. at Knoxville, April 15, 1988), perm. app. denied (Tenn. July 5, 1988). In an order denying permission to appeal that decision, the supreme court granted appellant a delayed appeal on his third post-conviction petition. Upon addressing the issues raised in appellant's third petition, this Court again affirmed the trial court's denial of post-conviction relief. See Jeffrey Stuart Dicks v. State, No. 275 (Tenn. Crim. App. at Knoxville, March 17, 1989), perm. app. denied (Tenn. July 3, 1989) (supplemental opinion).

The petitions at issue in this appeal were filed in 1989. Appellant filed his fourth petition, *pro se*, on June 1, 1989. He then filed a fifth petition, *pro se*, on June 29, 1989, the same date as his amended fourth petition. The State moved for consolidation of the petitions. Although no formal order of consolidation by the trial court appears in the record, our review indicates that the petitions were considered jointly.[3]

On November 7, 1994, the trial court held an evidentiary hearing on appellant's petitions.[4] By agreement of the appellant and the State, the issues at the hearing were limited to the application of the felony-murder aggravating circumstance and the validity of the heinous, atrocious, or cruel aggravating circumstance. In denying relief, the trial court reaffirmed our supreme court's finding that the murder was especially heinous, atrocious, or cruel and ruled that the jury's consideration of the felony-murder

---

[3]The fourth and fifth petitions were assigned separate docket numbers in the trial court, but used interchangeably on documents within the technical record. The trial court's order of dismissal refers only to the fourth petition. However, appellant's brief refers to this proceeding as "an appeal from the denial of the post-convictions four and five, which were combined . . ." The State's brief relies upon that assertion and considers this proceeding dispositive of both petitions. We note that during oral argument, appellant's counsel stated that the fourth and fifth petitions had been consolidated, although no formal order was contained in the technical record.

[4]There is no explanation in the record for this five year delay. We note that the first appearance of counsel, by way of a motion for discovery, was December 19, 1989. However, the post-conviction petition was not amended with the assistance of counsel until February 8, 1994.

3

aggravating circumstance was harmless beyond a reasonable doubt. Upon motion of the appellant to reconsider the issues, the trial court held another evidentiary hearing on March 22, 1996, and again denied relief.

## II. REMAND FOR EVIDENTIARY HEARING

While the record was being prepared for submission to this Court, it was discovered that a transcript from the November 7, 1994 evidentiary hearing was not available. An affidavit from the court reporter for the Criminal Court of Greene County reflects that she was unable to locate any record of the proceeding and, therefore, could not prepare a written transcript. Appellant maintains that the transcript of that hearing is necessary for this Court to perform an adequate review. As a result, he contends that the matter should be remanded to the trial court for a new evidentiary hearing.

In a previous ruling, we held that the appellant was not entitled to a remand on this issue. Prior to filing his brief, appellant made a motion in this Court requesting a remand based upon the missing transcript. We denied the motion upon finding that no new evidence was introduced at the November hearing. Moreover, we found that the issues raised in the November hearing were readdressed in the later hearing on March 22, 1996. We, therefore, concluded that any omissions from the November hearing were completely covered by the transcripts from the hearing in March. The appellant has failed to explain why the transcript from the March hearing is not adequate. We continue to abide by our earlier ruling.[5]

## III. MIDDLEBROOKS ERROR

Appellant next challenges his death sentence arguing that the felony-murder aggravating circumstance was found by the jury in violation of the rule announced in

---

[5]Appellant also requests a remand for a new evidentiary hearing because he did not receive a full and fair hearing on November 7, 1994. Appellant apparently overlooks the fact that a second hearing was held on March 22, 1996 in which the same issues were litigated. A review of that transcript fails to demonstrate that the trial court limited the presentation of any evidence. Moreover, we note that appellant's counsel and the State agreed to limit the issues to be considered in the November hearing. The substance of appellant's allegations relate more to his dissatisfaction with the trial court's ruling than an actual deficiency at the hearing. Appellant is not entitled to a remand.

4

State v. Middlebrooks, 840 S.W.2d 317 (Tenn. 1992). He further contends that the error cannot be demonstrated to be harmless beyond a reasonable doubt and that he is entitled to a new sentencing hearing.

This issue is without merit.

It is now a well-known principle that when a defendant is convicted of first degree murder solely on the basis of felony murder, then use of the aggravating circumstance that the murder was committed during the perpetration of a felony fails to sufficiently narrow the class of death-eligible offenders. See State v. Middlebrooks, 840 S.W.2d 317, 346 (Tenn. 1992). In order to satisfy the protections provided in the Tennessee Constitution, a finding of at least one other statutory aggravating circumstance is necessary. See id at 346-47. Because Middlebrooks announced a new constitutional rule which "materially enhances the integrity and reliability of the fact-finding process of the trial," that ruling has been held to apply retroactively. Barber v. State, 889 S.W.2d 185, 186 (Tenn. 1994), cert. denied 513 U.S. 1184, 115 S.Ct. 1177, 130 L.Ed.2d 1129 (1995). Therefore, the Middlebrooks rule applies in the appellant's case.[6]

The felony-murder aggravating circumstance was utilized in appellant's case in contravention of Middlebrooks. At the penalty phase of appellant's trial, the jury found two aggravating circumstances to justify the imposition of the death penalty: (1) the murder was committed while the defendant was engaged in the commission of a felony, and (2) the murder was especially heinous, atrocious, or cruel in that it involved torture or depravity of mind. See Tenn. Code Ann. §§ 39-2404(I)(5), (7) (Supp. 1978). In light of appellant's conviction of felony murder, the felony-murder aggravator cannot be used to support the appellant's death sentence. See Middlebrooks, 840 S.W.2d at 346.

---

[6]Because appellant's petitions were filed prior to the expiration of the statute of limitations on July 1, 1989, his claims must be considered timely. Tenn. Code Ann. §40-30-102 (repealed 1995); State v. Masucci, 754 S.W.2d 90, 91 (Tenn. Crim. App. 1988). Although preceding the decision in Middlebrooks, we note that the use of the felony-murder aggravating circumstance was fairly raised in appellant's fifth petition and fully addressed in the petition amended by counsel.

5

Nevertheless, this error does not automatically mandate a reversal of appellant's death sentence or require a new sentencing hearing. In considering the error, it is the duty of the reviewing court to examine the record of the evidence at trial and evaluate whether the error is harmless beyond a reasonable doubt. See State v. Howell, 868 S.W.2d 238, 259 (Tenn. 1993), cert. denied 510 U.S. 1215, 114 S.Ct. 1339, 127 L.Ed.2d 687 (1994). In performing that analysis, we must consider the following relevant factors: (1) the number and strength of the remaining valid aggravating circumstances; (2) the extent to which the prosecutor emphasized the invalid aggravating circumstance during closing argument; (3) the evidence admitted to establish the invalid aggravator; and (4) the nature, quality, and strength of the mitigating evidence. See id at 260-61. If we determine that the jury would have imposed the same sentence had it given no weight to the invalid aggravating circumstance, then the error is harmless and the sentence may be affirmed. See id at 262.

We conclude that the error in this case was harmless beyond a reasonable doubt.[7]

In conducting the harmless error analysis, we must first consider the strength and validity of the remaining aggravating circumstance. In this case we must address two fundamental issues: (1) whether the appellant's involvement in the crime was sufficient to warrant the application of the remaining heinous, atrocious, or cruel aggravator; and if so, (2) whether under a harmless error analysis, the jury would have imposed the death sentence using the heinous, atrocious, or cruel aggravator, without consideration of the invalid felony-murder aggravator.

The jury found the murder of James Keegan to be especially heinous, atrocious, or cruel in that it involved torture or depravity of mind. Tenn. Code Ann.

_____

[7]Appellant makes numerous references to co-defendant Strouth's trial transcript and relies on certain proof introduced at that trial. He also urges this Court to take judicial notice of Strouth's trial record. However, under harmless error analysis, the only relevant information is that which the jury in appellant's case considered in handing down the death sentence. See Howell, 868 S.W.2d at 260-61. Therefore, evidence from his co-defendant's trial, if not put before appellant's jury, is irrelevant.

6

§39-2404(I)(5) (Supp. 1978). However, the appellant first contends that the jury misunderstood the nature and meaning of the heinous, atrocious, or cruel aggravating circumstance. He specifically refers to the jury foreman's inability to pronounce certain words in the verdict form when the verdict was announced to the trial court.[8] According to appellant, the foreman's difficulty illustrates that the jury did not understand the meaning of the heinous, atrocious, or cruel aggravator and, hence, could not properly apply it to the facts. We disagree.

Initially, we find that the appellant has waived this issue by failing to raise it in an earlier proceeding. Tenn. Code Ann. § 40-30-112(b)(1) (repealed 1995). However, even if addressed on the merits, this issue would not entitle the appellant to relief.

Although the record reflects that the foreman had trouble pronouncing the word "atrocious," that proof alone does not demonstrate that the jury misunderstood the nature and meaning of the aggravator. To the contrary, the trial court carefully instructed the jury on the definitions of the words "heinous," "atrocious," and "cruel" in accordance with the law at that time. In reading its verdict to the court, the jury foreman simply indicated that he could not pronounce a few of the words on the form. We find no evidence that the jury misunderstood the heinous, atrocious, or cruel aggravator.

The appellant next contends that his level of personal involvement in the crime was not sufficient to warrant the application of the heinous, atrocious, or cruel aggravating circumstance. To support his argument, he relies on the Florida Supreme Court's decision in Omelus v. State, 584 So.2d 563 (Fla. 1991).

The appellant cites Omelus for the proposition that a convicted murderer who did not actually kill the victim cannot be held responsible under the heinous, atrocious, or cruel aggravator. In Omelus, the defendant hired another person to kill the victim

_____

[8]After several attempts to pronounce the words "atrocious" and "discharging," the trial court directed the foreman to spell the words for the record.

and did not provide any instruction as to how the murder should be accomplished.

See id. at 566.  In finding that the jury impermissibly considered the especially

heinous, atrocious or cruel aggravator, the court stated that, "where there is no

evidence of knowledge of how the murder would be accomplished, we find that the

heinous, atrocious, or cruel aggravating factor cannot be applied vicariously."  See id.

In reaching that conclusion, the court specifically noted that the defendant did not

know how the victim would be killed, nor was there evidence that the defendant had

directed the perpetrator to kill the victim in a particular manner.  See id.[9]

The issue of vicarious application as presented in Omelus has been addressed

by a panel of this Court on one prior occasion.  See William Groseclose v. State, No.

02C01-9407-CR-00145 (Tenn. Crim. App. at Jackson, August 23, 1995), perm. to

app. denied (Tenn. 1996).  The defendant in Groseclose was convicted of

premeditated murder for hiring two men to kill his wife.  Slip op. at 2.  On collateral

review, he challenged the vicarious application of the heinous, atrocious, or cruel

aggravating factor.  Slip op. at 6.  The Court first acknowledged that, under certain

circumstances, Tison permits the death penalty for accomplices who do not participate

in the killing.[10]  The Court then distinguished the Omelus case by observing that:

> Contrary to the facts in Omelus, the evidence introduced and established
> at trial in the instant case revealed that the appellant took an active part
> in the planning of the murder and in the preparatory steps to the murder
> itself.  The planning was begun three weeks prior to the death of the
> victim.  The appellant repeatedly told the hired killers to make the murder
> look like a "rape-robbery" and to leave the victim's body in her
> automobile.  On the morning of the planned murder, the appellant
> allowed [the killers] to enter a tool shed adjacent to the house.  At the
> appropriate time, the appellant then motioned for them to enter the
> house.  The victim at this time was asleep in her bedroom.  Based upon

---

[9]The Florida supreme court has reached the same conclusion in at least two other factually similar cases.  Williams v. State, 622 So.2d 456, 463 (Fla. 1993), cert. denied 510 U.S. 1000, 114 S.Ct. 570, 126 L.Ed.2d 470 (1993) (finding heinous, atrocious, or cruel aggravating circumstance inapplicable in murder-for-hire case where State failed to prove beyond reasonable doubt that defendant knew or ordered the particular manner in which the victims were killed); Archer v. State, 613 So.2d 446, 448 (Fla. 1993) (holding that the heinous, atrocious or cruel aggravating circumstance cannot be applied vicariously to a defendant who arranges for a killing, but is not present and who does not know how the murder will be accomplished).

[10]See slip op. at 6 (citing Tison v. Arizona, 481 U.S. 137, 107 S.Ct. 1676, 95 L.Ed. 2d 127 (1987)).

8

the appellant's active participation in the crime, it was proper for the jury to sentence the appellant to death in view of the heinous, atrocious and cruel nature of the killing.

Slip op. at 7.

The holding in Omelus is applicable in most murder-for-hire scenarios because, in those circumstances, the person paying to have the murder committed may have no involvement in the planning or in the method of the killing. Therefore, imposition of an aggravating factor which directly relates to the manner of killing may infringe the principles of individualized sentencing. See Tison v. Arizona, 481 U.S. 137, 160 n.3, 107 S.Ct. 1676, 95 L.Ed.2d 127 (1987) (Brennan, J. dissenting).

However, those concerns are not present in this case. The appellant was prosecuted and convicted for his active role in the robbery and felony murder of a seventy-year-old storekeeper. The facts and circumstances in this case are vastly different from both Omelus and Groseclose. Although appellant has maintained that he was not present in the store during the crime, which is arguably more akin to the culpability of the contractor in the murder-for-hire cases, we find that the facts support a finding that the appellant was personally involved in Mr. Keegan's actual murder.

Our supreme court has previously held that there was sufficient evidence to support a finding that the appellant was an active participant in the robbery and felony murder of James Keegan.[11] On the morning of February 16, 1978, Donald Wayne Strouth arrived at appellant's apartment and suggested that the two of them rob the "old man" at the Budget Shop. Thereafter, the appellant and Strouth "cased" the several blocks surrounding the shop. They examined the store location, the front entrances, and also searched the back alley for an escape exit. During that entire time, the appellant knew Strouth was armed with a hawkbill knife.

The evidence showed that appellant had done business in the Budget Shop some two weeks earlier and was acquainted with the owner, James Keegan. The

_____

[11]See State v. Dicks, 615 S.W.2d 126, 130-32 (Tenn. 1981).

9

appellant was aware that Mr. Keegan carried a roll of money in his front pocket. While "casing" the store area before the murder, appellant and Strouth passed Mr. Keegan walking on the street. Appellant pointed him out to Strouth and identified him as the owner of the store. The two even asked Mr. Keegan if he had closed the store for the day. During those fateful hours before the murder, Strouth repeatedly told the appellant they should commit the robbery that day. Strouth even suggested that appellant could hold the victim while Strouth took the money from his pocket. With that forewarning, the appellant continued to accompany and assist Strouth.

Later that same day, Mr. Keegan was found dead on the floor in the Budget Shop. Evidence from the police investigation revealed that money had been taken from Mr. Keegan's person and from his business. Additionally, there was evidence that Mr. Keegan had suffered fatal injuries to his head, face, and neck. An autopsy report revealed that Mr. Keegan suffered a skull fracture so severe that his skull was pushed in toward the brain. That particular injury caused bruising on the right side of Mr. Keegan's face and extensive hemorrhaging deep within his brain. According to testimony from the medical examiner, a blunt instrument caused the skull injury and rendered Mr. Keegan unconscious.

The autopsy also revealed that Mr. Keegan suffered multiple lacerations on his face, head, and neck. The first laceration was a jagged cut over Mr. Keegan's posterior right skull which penetrated the full thickness of the scalp at a depth of one-half to three-quarters of an inch. The second laceration was located across Mr. Keegan's right ear extending completely through the cartilage. The third and fatal laceration was an incision in Mr. Keegan's throat extending from ear to ear at a depth of nearly two inches. The medical examiner stated that Mr. Keegan could have lived

for up to fifteen minutes after the infliction of the throat wound.[12] The ultimate cause of death was loss of blood.

The graphic nature and extent of Mr. Keegan's injuries, as described in the record, evinces that the murder was especially heinous, atrocious, and cruel. Those injuries went over and above that necessary to cause death and support a finding that the perpetrators were grossly wicked, extremely evil, and clearly disposed to inflict pain upon their victim. State v. Williams, 690 S.W.2d 517, 529 (Tenn. 1985) (defining the terms heinous, atrocious, cruel, torture, and depravity of mind). Furthermore, the cruelty with which the assailants attacked Mr. Keegan, showing no mercy toward him after he was unconscious and helpless, further demonstrates depravity of mind.[13]

There is no question that Strouth and the appellant were the sole perpetrators of those heinous events. As previously determined by our supreme court, the evidence demonstrates that the appellant was actively involved in the crime and was not merely waiting for Strouth outside the store. On direct appeal, the supreme court stated that:

> [T]he evidence indicates that appellant's activities exceeded the mere accompanying of Strouth and driving of the get-away automobile. After the robbery and murder, two sets of footprints were found outside the rear entrance of the Budget Shop. Both sets of footprints were spaced so that they clearly indicated the persons making the prints "were running" as they left the shop. At the approximate time of the robbery and homicide, appellant and Strouth were observed on the roadway near the mouth of the alley leading from the Budget Shop running toward the home of appellant. Immediately on reaching his home, appellant collected his girlfriend and left Kingsport, taking no possessions with him. Further, appellant admits taking a "few" dollars from the robbery proceeds and used them in getting away from Kingsport. We think a jury reasonably could find from this evidence that appellant was an active participant in the robbery and murder of Mr. Keegan and was not, as appellant claimed, waiting for Strouth in an automobile.

See State v. Dicks, 615 S.W.2d 126, 130 (Tenn. 1981).

_____

[12]Dr. James Wilford, the autopsy examiner, testified that Mr. Keegan was unconscious or restrained at the time he received the knife wound across his neck. He based that opinion upon evidence that the throat laceration was smooth and that no blood was found on the victim's hands.

[13]See State v. Zagorski, 701 S.W.2d 808, 814 (Tenn. 1985), cert. denied 478 U.S. 1010, 106 S.Ct. 3309, 92 L.Ed.2d 722 (1986) (holding that infliction of gratuitous violence and needless mutilation of victims who were already helpless evinced depravity of mind).

Based upon that finding, the supreme court concluded that the appellant's personal involvement in the crime supported the imposition of the death penalty.[14] We adhere to that ruling and further conclude that the heinous, atrocious, or cruel aggravator was properly applied to the appellant.

Although the proof regarding the events inside the store was circumstantial, the physical evidence of two sets of footprints leaving the rear of the store demonstrated that appellant was inside the store during the crime. Also, there was evidence from eyewitness testimony that the appellant and Strouth were seen running through the back alley away from the store near the time of the murder.[15]

The State's theory was that appellant participated in the crime by striking Mr. Keegan on the head with a rock, rendering him unconscious. Based upon proof that Strouth was armed with the hawkbill knife, the State theorized that the appellant attacked Mr. Keegan with a rock before Strouth cut Mr. Keegan's throat. The medical examiner, Dr. James Wilford, testified that Mr. Keegan did not struggle when the fatal neck wound was inflicted. Therefore, according to Dr. Wilford, Mr. Keegan was either disabled by the skull injury or restrained by one of the assailants when his throat was cut.

That evidence reasonably supports a finding that the appellant had a direct role in the robbery and felony murder of Mr. Keegan. Even without a finding that the appellant personally committed the brutal killing, the evidence shows that the appellant actively planned and carried out the robbery, he benefited from the proceeds of the robbery, and he was present in the store as an aider and abettor when Mr. Keegan was attacked and left to die. Moreover, the appellant made no attempt to prevent the robbery or the felony murder. Instead, he participated in the planning and

_____

[14]The supreme court upheld the appellant's death sentence upon determining that the sentence was proportional to the appellant's role in the crime. See 615 S.W.2d at 130.

[15]The State also introduced evidence that the appellant was wearing a green overcoat on the day of the murder. The State alleged that the coat had blood on the hem, signifying appellant's presence and participation in the murder. The coat was mysteriously burned at the home of appellant's mother before the appellant was arrested.

12

execution of the robbery and thereafter ran away from the scene while Mr. Keegan was unconscious and bleeding on the floor.

We, therefore, uphold the application of the heinous, atrocious, or cruel aggravator. The strength and validity of that remaining aggravator is supported by proof that the appellant was directly involved and personally culpable for the robbery and felony murder of James Keegan.[16]

Under the second prong of the harmless error analysis, Howell directs us to consider the extent to which the prosecutor emphasized the invalid felony-murder aggravator in the closing argument. See 868 S.W.2d at 261. Our review of the record reveals that the district attorney did not place any undue emphasis on the invalid aggravating circumstance.

During the closing argument, the State argued that four aggravating circumstances applied in appellant's case. In the initial argument, the prosecutor referred to the felony-murder aggravator only once. The prosecutor simply stated that it was the fourth aggravating circumstance applicable to the appellant and that it had been proven by the jury's verdict of guilt. Thereafter, in the rebuttal argument, the prosecutor vehemently argued for the application of another aggravator, that the murder was committed to avoid arrest or prosecution. We conclude that the prosecutor's references to the felony-murder aggravator were minimal and had no undue influence on the jury.

Also relevant to our analysis under Howell is the evidence that the State offered to establish the invalid aggravating circumstance. We must consider whether the invalid aggravator was established by evidence that was materially inaccurate or

---

[16]We acknowledge the appellant's further contention that the heinous, atrocious, or cruel aggravator is unconstitutional and should not be considered in the harmless error analysis. However, we find that this issue was previously addressed and rejected by our supreme court on direct appeal. See State v. Dicks, 615 S.W.2d at 131-32. Furthermore, in his second post-conviction petition, the appellant specifically challenged the applicability of that aggravator in light of State v. Williams, 690 S.W.2d 517 (Tenn. 1985). In denying relief on that issue, we noted that the issue had been considered in the direct appeal and that Williams did not apply retroactively. See Jeffrey Stuart Dicks v. State, No. 275 (Tenn. Crim. App. At Knoxville, April 15, 1988), *per. app. denied* (Tenn. July 5, 1988). We reaffirm our previous determination and decline to further address this issue.

13

admissible only to support the invalid aggravator, or whether the evidence was otherwise admissible in the guilt or sentencing phases. See Howell, 868 S.W.2d at 261. Evidence that the murder was committed during the commission of a felony was admitted during the guilt phase and resulted in appellant's conviction of felony murder. At the sentencing hearing, no additional evidence was introduced to support the felony-murder circumstance. We find that the evidence supporting the felony-murder aggravator was accurate and admissible both in the guilt phase and penalty phase of appellant's trial. However, although the evidence was introduced and used in the guilt phase, it was not emphasized at sentencing. We find no reversible error in the use of that evidence.

Lastly, under Howell, we must consider the nature, strength, and quality of the relevant mitigating evidence. See 868 S.W.2d at 262. At the sentencing hearing, the appellant addressed six mitigating factors in his closing argument: (1) the defendant had no significant criminal history; (2) the murder was committed while under the influence of extreme emotional or mental disturbance; (5) the defendant was an accomplice in a murder committed by another person, and his participation was relatively minor; (6) the defendant acted under extreme duress or substantial domination of another person; (7) the defendant was young at the time of the crime; and (8) the defendant was acting under a mental defect which substantially impaired his capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law. Tenn. Code Ann. §39-2404(j) (Supp. 1978).

The appellant offered the testimony of Doctor David McMillan, a clinical psychologist who evaluated the appellant before trial. Dr. McMillan described the appellant as a passive, dependent, and weak person who used repression and denial as defense mechanisms. He stated that although the appellant had a normal IQ of ninety (90), he had poor common sense and suffered from a basic character disorder. In describing that disorder, Dr. McMillan testified that the appellant was a passive follower who usually sought out dominating people. According to Dr. McMillan, the

appellant would have been unable to initiate and carry out the definitive act of robbery by himself, but instead would have participated as a follower. He further indicated that the appellant had a "desert personality," meaning that the appellant had nothing "inside" to process events which happen to him.

On cross examination, Dr. McMillan admitted that by projecting a passive and helpless personality, the appellant had developed a manipulative behavior in which he encouraged other people to accomplish his goals.[17] In the context of criminal activity, Dr. McMillan testified that the appellant's involvement in a robbery would probably have been to suggest a place to rob, show the leader the location, and participate in the planning and surveying for the robbery. Lastly, Dr. McMillan stated that, although difficult, the appellant recognized the difference between right and wrong and could have controlled his conduct.

Based upon the above evidence, and other proof in the record, we find that there was no mitigating evidence sufficient to reduce the appellant's culpability for the crimes. First, we find that the appellant had a history of criminal activity. Appellant testified at trial that he was "wanted" in North Carolina for writing worthless checks in the amount of $14,000. At the time of the felony murder, he was fleeing from that charge and living under an assumed name. Although appellant's criminal history was non-violent, it was nevertheless significant and it diminished the strength of any mitigating factors.

Moreover, the record fails to support the contention that appellant was operating under an extreme mental disturbance or under substantial domination from another person. Although there was evidence that the appellant was a follower who acted under a basic character disorder, the appellant's only witness at sentencing admitted that the appellant could distinguish between right and wrong. Furthermore, as previously determined, the appellant was an active participate in the planning and

---

[17]Dr. McMillan indicated that people with character disorders often become involved in criminal activity.

execution of the crime. We find no evidence that the appellant was forced into the robbery by another person.

Lastly, although we acknowledge that the appellant was only twenty (20) years old on the date of the crime, we find that appellant's age had little mitigating value in this case. The appellant had chosen to live on his own in Kingsport, Tennessee after moving from North Carolina under an assumed name. While criminal charges were pending in North Carolina, the appellant accompanied his friend, Strouth, to the Budget Shop where the two planned and eventually carried out the robbery and felony murder of James Keegan. Thereafter, the appellant fled to South Carolina and to Pennsylvania under a new alias. Based upon those acts, we conclude that the appellant's age was not a significant factor.

In sum, after a careful review of the factors and evidence as mandated by our supreme court in Howell, we conclude that the jury's consideration of the invalid aggravating circumstance was harmless beyond a reasonable doubt. The remaining aggravating circumstance was supported by the proof; the prosecutor did not target the invalid aggravator in his closing argument; no inadmissible evidence was introduced to support the invalid aggravator; and the mitigating circumstances were insignificant in light of the incriminating proof at trial. We are confident that the appellant's death sentence would have been the same had the jury given no weight to the invalid felony-murder aggravator.[18]

## IV. JURY INSTRUCTIONS ON MITIGATING CIRCUMSTANCES

Appellant next contends that the jury instruction prohibited the jury from considering a mitigating factor unless the jury unanimously agreed upon it. Because the appellant failed to pursue this issue in an earlier proceeding, we must consider it waived. See Tenn. Code Ann. §40-30-112(b)(1) (repealed 1995). Nothing in the

_____

[18]See Barber v. State, 889 S.W.2d 185, 188-89 (Tenn. 1994), cert. denied 513 U.S. 1184, 115 S.Ct. 1177, 130 L.Ed.2d 1129 (1995) (holding the application of the felony-murder aggravator harmless beyond a reasonable doubt where remaining aggravator - especially heinous, atrocious, or cruel - was supported by proof that elderly victim was murdered by repeated blows to the head).

16

record demonstrates why this issue was not raised in an earlier appeal, and we find that it is no longer viable. Tenn. Code Ann. §40-30-112(b)(2) (repealed 1995). Moreover, any attempt to pursue this claim on the merits is fruitless. Our supreme court has continuously upheld identical jury instructions in the face of similar challenges.[19]

## CONCLUSION

After a review of the extensive record in this case, we conclude that the appellant is not entitled to relief from his death sentence. Our examination of the evidence and applicable law reveals that the jury's consideration of the felony-murder aggravator was harmless beyond a reasonable doubt. Despite appellant's efforts to re-litigate the facts concerning his role in the crime, we find that his arguments are without merit. We, therefore, uphold the judgment of the trial court and affirm the sentence of death. Unless stayed by a court of competent jurisdiction, the appellant's sentence of death by electrocution shall be carried out on June 9, 1998.

_____
WILLIAM M. BARKER, JUDGE

CONCUR:

_____
GARY R. WADE, JUDGE

_____
PAUL G. SUMMERS, JUDGE

---

[19]See State v. Bigbee, 885 S.W.2d 797, 814 (Tenn. 1994); State v. Nichols, 877 S.W.2d 722, 735 (Tenn. 1994), cert. denied 513 U.S. 1114, 115 S.Ct. 909, 130 L.Ed.2d 791 (1995); State v. Harris, 839 S.W.2d 54, 74 (Tenn. 1992), cert. denied 507 U.S. 954, 113 S.Ct. 1368, 122 L.Ed.2d 746 (1993); and State v. Bates, 804 S.W.2d 868, 882 (Tenn. 1991), cert. denied 502 U.S. 841, 112 S.Ct. 131, 116 L.Ed.2d 98 (1991).