584 So.2d 563 (1991)
Ulrick OMELUS, Appellant, Cross-Appellee,
v.
STATE of Florida, Appellee, Cross-Appellant.
No. 73911.
Supreme Court of Florida.
June 13, 1991.
Rehearing Denied September 17, 1991.
James B. Gibson, Public Defender and Larry B. Henderson, Asst. Public Defender, Daytona Beach, for appellant, cross-appellee.
Robert A. Butterworth, Atty. Gen. and Barbara C. Davis, Asst. Atty. Gen., Daytona Beach, for appellee, cross-appellant.
PER CURIAM.
Ulrick Omelus appeals his first-degree murder conviction and the trial judge's imposition of a death sentence in accordance with the jury's recommendation.[1] For the reasons expressed in this opinion, we affirm Omelus's conviction. We find, however, that we must vacate his death sentence and remand for a new sentencing hearing before a new jury because of the presentation of an improper aggravating factor to the jury during the penalty phase.
The facts of this case are as follows. On October 31, 1986, John Henry Jones reported that he had found a body approximately 210 feet east of the railroad tracks in an overgrown area behind the ABC Lounge in Cocoa. The sheriff's deputy who responded found the body of a black male, later determined to be Willie Mitchell. Mitchell apparently had been assaulted roughly twenty feet from where the body was lying. *564 Blood was on the body, which was lying face down amid shrubs and high weeds, and multiple stab wounds were visible on the neck and thorax area. An autopsy performed the next morning revealed that Mitchell died from multiple stab wounds, primarily in the chest and neck area, front and back. There were at least nineteen wounds consistent with having been inflicted with a single-edged knife, and several wounds had been inflicted after death. Mitchell also had defensive wounds on his hands and wrists. A toxicology report revealed the presence of cocaine and marijuana in Mitchell's blood.
Gerald Crayton, who was facing charges for possession and sale of cocaine, had a taped conversation with John Henry Jones that implicated Jones in the murder of Mitchell. Jones was subsequently taken into custody and pleaded guilty to the murder of Mitchell under an agreement that he would receive a life sentence and would testify truthfully at the trial of Ulrick Omelus.
Jones testified at trial that Omelus had hired him to kill Mitchell; that originally they had met when Omelus brought some cocaine to a house which Jones was remodeling; that the second time they met, Omelus asked Jones if he knew anyone who could help him collect on some cocaine debts owed to him; that Jones later told Omelus that he would take the job; and that, at their next meeting, Omelus told Jones that he wanted him to murder someone so Omelus could collect the benefits of a life insurance policy. Jones also testified that on the last Friday of August, 1986, Jones and Omelus went to West Cocoa to see Gerald Crayton to obtain a weapon (a gun) and that Jones and Omelus later discussed the murder of Willie Mitchell, though Mitchell was not mentioned by name. On October 30, 1986, Jones and Omelus picked up Mitchell in Omelus's car. When they stopped at a convenience store, Omelus told Jones that Mitchell was the man whom Jones was to kill. After leaving the convenience store, the three men stopped so Omelus could buy some cocaine, which he gave to Jones and Mitchell, and Omelus then dropped them off at Jones's nephew's house. Jones and Mitchell spent the day smoking and selling cocaine. Jones saw Crayton during the day and asked him for a weapon, but Crayton did not have one. Jones later obtained a knife from another individual. Around 2:00 or 3:00 a.m. on October 31, Jones bought more cocaine. Mitchell then wanted to go home, and, while they were walking by the railroad tracks, Jones killed Mitchell by stabbing him.
Wayne Hagerman, an insurance salesman, testified that Omelus had recently assisted a man claiming to be Mitchell to obtain a life insurance policy. Hagerman had previously sold an insurance policy to Omelus and to others whom Omelus had brought to him. On November 5, five days after Mitchell's murder, Omelus told Hagerman that Mitchell had died from wounds he received in a knife fight. Hagerman became suspicious and called the police.
In addition to the testimony of Hagerman and Jones, the state presented the testimony of the man at whose house the three men had stopped to buy cocaine, as well as the testimony of Crayton, the man who had originally informed on Jones. The defense presented no witnesses during the guilt phase, and the jury found Omelus guilty as charged.
At the penalty phase hearing, the state presented one witness, the medical examiner. The defense presented testimony, including Omelus's own testimony, concerning Omelus's impoverished background in Haiti, his immigration to the United States, his charity toward others, his religiosity, and his relationship with his son. The state, in its argument to the jury, stressed that three aggravating circumstances were clearly established by the evidence, specifically: (1) that the murder was committed for pecuniary gain;[2] (2) that the murder was committed in a cold, calculated, and premeditated manner without any pretense of moral or legal justification;[3] and (3) *565 that the murder was especially heinous, atrocious, or cruel.[4] The state focused especially upon the last factor, that the murder was especially heinous, atrocious, or cruel. The jury returned a recommendation of death by an eight-to-four vote.
The trial judge subsequently imposed the death penalty, finding two aggravating circumstances: (1) that the murder was committed for pecuniary gain and (2) that it was committed in a cold, calculated, and premeditated manner. The trial judge found as a mitigating circumstance the fact that John Henry Jones, who actually committed the murder, received a life sentence. We note that the trial judge did not find as an appropriate aggravating circumstance that the murder was especially heinous, atrocious, or cruel.

Guilt Phase
Omelus raises four issues concerning the guilt phase of his trial. He contends that (1) the trial court abused its discretion in denying his motion for mistrial due to the prosecutor's improper comments and question; (2) the trial court erred in denying his motion for acquittal based upon the state's failure to present a prima facie case of the precise offense charged in the indictment; (3) the trial court erred in restricting his cross-examination of state witnesses; and (4) the jury was improperly exposed to evidence during deliberations that was not introduced into evidence in open court. Claims (2) and (3) are without merit and require no discussion. With regard to claim (4), Omelus presumes that the jury saw certain evidence that was included in the record on appeal. However, there is nothing in this record to show that the jury saw any excluded evidence, so that claim is without merit.
The first claim, that improper Williams[5] rule evidence was presented to the jury by the prosecutor's making an allegedly improper comment during his opening statement and by his asking an allegedly improper question of one witness, requires discussion. During the opening statement, the prosecutor stated:
Now, during the time that intervened, he and the Defendant became a little closer friends and at one point, for instance, they spent some time together trying to find a murder weapon. They went to see a fellow named Gerald Crayton. That name sounds familiar, I'm sure. And they managed, the two of them together, to obtain a gun from Mr. Crayton. They purchased a gun from Mr. Crayton.
Mr. Jones will tell you that that gun, unfortunately, due to his situation as a drug addict himself, he eventually sold it off to someone else for some money and by the time they got around to doing this murder he could no longer get that gun.
On another occasion, he and the Defendant went down to Wabasso together, he took him down there. And the Defendant put him up in a motel for the night. In fact  I'm sorry, it's not another occasion, it's an extension of the day when they got the gun, that same day; after they bought the gun the Defendant took him down to Wabasso to show him the man he wanted killed. And while they were down there .
At that point, defense counsel moved for a mistrial on the grounds that the prosecutor's allusion to another murder constituted Williams rule evidence which had previously been declared irrelevant and highly prejudicial. The trial judge had, in fact, previously granted a motion in limine concerning evidence of another murder, requiring that it be proffered to the court before being presented to the jury. However, the trial judge denied the motion for mistrial, finding that the jury would be unable to figure out, based on this statement, that another murder was committed and finding that the statement was "neutral at this point."
Later in the trial, the prosecutor questioned John Henry Jones as follows:

*566 Q. Let me ask you this, at the time he was talking about this, about the insurance, did he tell you what the victim's name was then?
A. No, they didn't know, he did not mention his name.
Q. Okay, but at any rate, at this point now the conversations have turned to committing a murder?
A. Yes.
Q. Did you agree to do that?
A. Yes, I did.
Q. And at that time he did not specify who the victim was going to be.
A. No.
Q. Did he give you any indication whether he intended for you to do one murder or whether he was thinking of others?
A. He mentioned 
[Defense Counsel]: Judge, I'll object.
THE COURT: Sustained.
[Defense Counsel]: May we approach the bench?
THE COURT: Yes.
Defense counsel again moved for a mistrial on the same grounds. The trial judge denied the motion and granted defense counsel's request for a curative instruction. The state maintains that the prosecutor merely intended to establish the relationship between Jones and Omelus, which is relevant and admissible. We find no reversible error. Viewed in the context of the evidence presented, the jury, in our view, would not have known that there was a second murder unless they had prior knowledge and could distinguish minor factual variations in the two murders. Clearly, the error, if any, was harmless beyond a reasonable doubt. See State v. DiGuilio, 491 So.2d 1129 (Fla. 1986).

Penalty Phase
Omelus raises five claims concerning the penalty phase of his trial. We need address only his claim that the trial court erred in instructing the jury that it could properly consider as an aggravating factor that this murder was especially heinous, atrocious, or cruel. We must agree with Omelus that the trial court erred in instructing the jury that it could consider this factor in determining its recommendation. Nowhere in this record is it established that Omelus knew how Jones would carry out the murder of Mitchell, and, in fact, the evidence indicates that Jones was supposed to use a gun. There is no evidence to show that Omelus directed Jones to kill Mitchell in the manner in which this murder was accomplished. Under these circumstances, where there is no evidence of knowledge of how the murder would be accomplished, we find that the heinous, atrocious, or cruel aggravating factor cannot be applied vicariously. We note that the trial judge correctly omitted this aggravating factor from his sentencing order in finding that the death penalty would be appropriate.
We have reviewed the record in this case to determine whether this error was harmless beyond a reasonable doubt. We note that the state in the penalty phase presented the medical examiner as its only witness. In arguing to the jury that the heinous, atrocious, or cruel aggravating circumstance applied, the state discussed the medical examiner's testimony and asserted that Mitchell
was stabbed nineteen times and slashed twenty-three times, a total of forty-two wounds on the body; that he lived for a period of time after this; that he knew he was going to be killed and he tried to defend himself and received cuts on his hands, wrists. Pled for his life, experienced excruciating pain from these wounds and the agony of drowning in his own blood.
The prosecutor concluded his argument on this aggravating circumstance by stating that
the hand that held that knife, that knife that stabbed, slashed and mutilated Willie Mitchell, left him still alive bleeding to death strangling and choking on his own blood, that hand was controlled in all respects by this Defendant. This Defendant knew John Henry Jones' character. He conspired with him knowing that John Henry Jones was Ulrick Omelus' private monster waiting to be unleased.
*567 The defense, in its argument, took issue with the state's assertions, particularly concerning the application of the heinous, atrocious, or cruel aggravating factor. Defense counsel argued that Omelus did not intend for Jones to inflict a high degree of pain on Mitchell, did not know that Jones was going to use a knife, and, in fact, thought that Jones would use a gun. In addition, defense counsel argued that a number of nonstatutory mitigating factors applied, and he stressed that the following two mitigating factors applied: "Mr. Omelus didn't kill anybody, he was merely an accomplice. The crime was captained by somebody else. And the second one is John Henry Jones, the guy who did the killing got life." As previously stated, the jury recommended death by an eight-to-four vote.
Since the trial judge correctly did not include heinous, atrocious, or cruel as a factor in imposing the death sentence, the question that must be resolved in our harmless error analysis is whether the error in allowing this factor to be presented and considered by the jury requires a new sentencing proceeding. We find it difficult to consider the hypothetical of whether the trial court's sentence would have been an appropriate jury override if the jury had not received the argument on the heinous, atrocious, or cruel factor and had recommended a life sentence. Further, because the issue is not in this record, the parties have not argued the propriety of a jury override in the briefs or at oral argument. We conclude that it is not appropriate for us to attempt to address that question in this case under these circumstances. Although the circumstances of a contract killing ordinarily justify the imposition of the death sentence, we are unable to affirm the death sentence in this case because, given the state's emphasis on the heinous, atrocious, or cruel factor during the sentencing phase before the jury, the fact that the trial court found one mitigating factor, and the fact that the jury recommended the death sentence by an eight-to-four vote, we must conclude that this error is not harmless beyond a reasonable doubt under the standard set forth in DiGuilio.
For the reasons expressed, we affirm Omelus's conviction for first-degree murder, vacate the death sentence, and remand for a new sentencing proceeding before a new jury.[6]
It is so ordered.
SHAW, C.J., and OVERTON, McDONALD and BARKETT, JJ., concur.
GRIMES, J., concurs in part and dissents in part with an opinion, in which KOGAN, J., concurs.
GRIMES, Judge, concurring in part, dissenting in part.
If a person contracts for another to commit murder and the murder is committed in a heinous, atrocious, or cruel manner, I do not see why the aggravating factor of heinous, atrocious, or cruel cannot be imposed against that person. The one who instigated the evil act should suffer the consequences wrought by his agent. In any event, because this was a contract killing involving minimal mitigating circumstances, I believe the instruction on heinous, atrocious, or cruel constituted harmless error. See Haliburton v. State, 561 So.2d 248 (Fla. 1990), petition for cert. filed (U.S. June 20, 1990) (No. 90-5512). I concur in the judgment of guilt but dissent as to the necessity of resentencing.
KOGAN, J., concurs.
NOTES
[1] We have jurisdiction. Art. V, § 3(b)(1), Fla. Const.
[2] § 921.141(5)(f), Fla. Stat. (1985).
[3] § 921.141(5)(i), Fla. Stat. (1985).
[4] § 921.141(5)(h), Fla. Stat. (1985).
[5] Williams v. State, 110 So.2d 654 (Fla.), cert. denied, 361 U.S. 847, 80 S.Ct. 102, 4 L.Ed.2d 86 (1959).
[6] We find no basis to address the state's claims on cross-appeal.