PER CURIAM.
Tiffany Ann Cole was convicted of two counts of first-degree murder, two counts of kidnapping, and two counts of robbery for the 2005 murders of James and Carol Sumner. Cole was sentenced to death for each murder. This case is before the Court on appeal from her convictions and death sentences. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const. For the reasons that follow, we affirm the convictions and sentences.
I. BACKGROUND
The evidence presented at trial established that on the night of July 8, 2005, Cole and codefendants Michael James Jackson, Bruce Kent Nixon, Jr., and Alan Lyndell Wade robbed, kidnapped, and murdered the victims.[1] At trial, the evidence primarily consisted of codefendant Nixon’s testimony, Cole’s taped interview with Homicide Detective David Meacham of the Jacksonville Sheriffs Office (JSO), and Cole’s in-eourt testimony.
Cole was the only codefendant who knew the victims. The victims were friends with and previous neighbors of Cole’s father before the victims moved from the Charleston, South Carolina, area to Jacksonville, Florida. The victims also had recently sold Cole a vehicle and informed her that she was welcome at their home if she was ever in Jacksonville. The plan to rob and murder the victims evolved from knowledge that Cole already had about the victims and that she obtained from the victims in the weeks prior to the crimes.
Cole and Jackson met and became involved in a personal relationship two *600 months before the crimes. During that two-month period, Cole and Jackson often traveled together. In June 2005, Cole and Jackson went to Jacksonville, Florida, to visit Jackson’s friend Wade. During this visit, Cole contacted the victims, and Cole and Jackson stayed one night at the victims’ home. During the visit, Mrs. Sumner informed Cole that she and Mr. Sumner had recently sold their home near Charleston, South Carolina, and had profited $99,000. Following the initial trip to Jacksonville and additional trips between Charleston and Jacksonville, Cole, Jackson, Wade, and Wade’s friend Nixon developed a plan to rob the victims. At the time of the crimes, Cole and Jackson were twenty-three years old and Wade and Nixon were eighteen years old. The victims were in their early sixties but were both in poor health and especially frail.
In preparation for the robbery, Nixon stole four shovels to dig a hole. From a rental agency in South Carolina, Cole had previously rented a Mazda RX-8, which she used to transport the group. Two days before the murders, Cole, Jackson, and Wade picked Nixon up in the Mazda. The group drove around until they selected a remote location — in Georgia, just across the Florida state line — to dig a large hole. While Cole held a flashlight, Jackson, Wade, and Nixon dug the hole, which was approximately four feet deep and six feet square. The group left the shovels at the hole when they completed the excavation. Nixon testified that in the two days after digging the hole, the foursome drove around discussing “what [they] were going to do” and “how [they] were going to do it.” He stated that the foursome planned the robbery together and that Cole was the one who knew the victims and who “set everything up.” The group initially did not know whether they would enter the Sumners’ home while the victims were home and kidnap the victims or wait until the victims were away from their home. Nixon testified that Cole knew when the victims would be away from their home for a doctor’s appointment. The foursome ultimately decided that they would kill the victims. Nixon testified that Jackson informed the others that he would kill the victims at the grave site by injecting them with a lethal dose of medication.
On the night of the crimes, July 8, 2005, Cole and her codefendants purchased duct tape and plastic wrap. Cole wrote a personal check for these items. Later that night, Cole drove the foursome to the victims’ home. Initially, Cole and Jackson remained outside in the rented Mazda. Wade and Nixon knocked on the door, and when Mrs. Sumner responded, Wade asked to use her telephone. After Mrs. Sumner allowed Wade and Nixon into her home, Wade ripped the telephone cord from the wall. Nixon held the victims at gunpoint with a toy gun, took the victims to a bedroom, and bound them with duct tape. After Wade and Nixon contacted Jackson through Nextel two-way radio phones — which the group used to communicate throughout the course of the crimes — Jackson entered the victims’ home. Jackson and Wade then searched the victims’ home for bank account records. Cole drove down the street and waited in the Mazda. Eventually, the victims were taken to their garage and forced into the trunk of their Lincoln Town Car. Cole drove back to the victims’ home in the Mazda after Jackson called her. Jackson placed a trash bag containing some of the victims’ belongings in the Mazda’s trunk and got into the Mazda. Wade and Nixon then drove the victims’ Lincoln to a gas station to refuel it, and Cole and Jackson followed in the Mazda.
The foursome, with the victims in the Lincoln’s trunk, then drove to the remote *601 Georgia location where they had previously dug the large hole. Upon arrival, Cole remained with the Mazda at the edge of the road, while her codefendants drove the Lincoln into the woods to the hole. At some point, Nixon joined Cole at the road. The evidence shows that only Jackson and Wade were present at the hole when the victims were put into the hole and buried alive. When Jackson returned from the woods to the Mazda, Jackson had the personal identification number (PIN) for the victims’ automated teller machine (ATM) card. The foursome drove both cars from the grave site to Sanderson, Florida, where they wiped down the Lincoln and abandoned it. The foursome then left in the Mazda, with Cole driving.
The group next stopped at an ATM in Jacksonville, from which Jackson withdrew money from the victims’ bank account. The group then retired to a motel. Later that night, after purchasing Clorox and gloves, Cole and Wade returned to the victims’ home. The evidence shows that at that time Cole and Wade took the victims’ computer from the home. Subsequently, Cole pawned Mrs. Sumner’s rings and the victims’ computer.
On July 10, 2005, Rhonda Alford, Mrs. Sumner’s daughter, reported to the JSO that she had been unable to contact the victims for several days. That same day, Officer Vindell Williams of JSO spotted a Lincoln Town Car in Sanderson that was later determined to be the victims’ Lincoln. On July 12, 2005, Homicide Detective David Meacham of the JSO responded to the victims’ home to investigate. In their home, he saw a bank statement that showed a large sum of money in the victims’ bank account. After contacting the bank, he learned that during the past few days there had been an unusually large amount of ATM withdrawals — totaling several thousand dollars — from the victims’ account.
Later on July 12, Detective Meacham learned that someone claiming to be Mr. Sumner had contacted the JSO. Detective Meacham returned the call. The person claiming to be Mr. Sumner was later identified as codefendant Jackson. As Mr. Sumner, Jackson asked Detective Meac-ham to assist him in accessing his bank account; by that time Jackson was apparently having trouble accessing the account. As Mr. Sumner, Jackson explained that he and Mrs. Sumner had left town quickly to attend Mrs. Sumner’s sister’s funeral in Delaware. When Detective Meacham asked to speak to Mrs. Sumner, Cole posed as Mrs. Sumner and pretended to be tired and ailing. Detective Meacham contacted the bank and requested that it continue to allow access to the victims’ account so that Detective Meacham could continue his investigation.
Since Detective Meacham suspected that he was not actually speaking to the Sum-ners, he contacted United States Marshal David Aired to assist in tracking the cellular telephone number used by the callers. The cell phone was registered to Jackson and had been used near the victims’ home around the time of the victims’ abduction. The cell phone records also showed calls to a South Carolina rental car company. Detective Meacham contacted the company, which indicated that it had rented a silver Mazda RX-8 to Cole and that the car was overdue. Using the rental car global positioning system, law enforcement officers determined that the Mazda had been within blocks of the victims’ home on the night of the murders.
As Detective Meacham continued to investigate the victims’ disappearance, Jackson continued to withdraw money from the victims’ bank account. Jackson made multiple ATM withdrawals from the victims’ *602 bank account between the early hours of July 9 and the night of July 13, 2005. Photo surveillance captured Jackson making several of these withdrawals. Cole drove Jackson to the ATM machines in the rented Mazda; the Mazda could be seen in some of the surveillance photographs.
Detective James Rowan of the North Charleston Police Department testified that he found the rented Mazda in the parking lot of an abandoned office building near the rental company. Detective Rowan went to Cole’s residence near Charleston, South Carolina, and David Duncan, Cole’s brother, led Detective Rowan and other officers to the nearby Best Western Hotel where Cole, Jackson, and Wade were staying. Two rooms were rented to Cole. At the motel, officers found and arrested Cole, Jackson, and Wade. The police obtained a search warrant for the motel rooms. In the motel room where Cole and Jackson were staying, police found the victims’ South Carolina driver licenses, credit cards, checkbook, mail, and papers indicating the victims’ America Online account and passwords, social security numbers, and birthdates. In the same room, police found what appeared to be a new laptop computer and bags of new merchandise. Additionally, officers found photographs showing Cole, Jackson, Wade, and another female, who was uninvolved in the crimes, “partying” in Myrtle Beach before the crimes. The victims’ ATM card was found in Jackson’s back pocket. In the motel room where Wade was staying, police found a key ring that belonged to the victims. The victims’ coin collection was found in the trunk of Cole’s car.
Detective Meacham testified that he drove to Charleston immediately after learning that Cole, Jackson, and Wade were apprehended. A recording of Detective Meacham’s July 14, 2005, interview of Cole was played for the jury. In it, Cole admitted that before the crimes she had gone to Myrtle Beach with Jackson, Wade, and another female uninvolved in the crimes. Cole stated that the group stayed in a hotel room, “[sjpending money up there, partying up there.” She stated also that on the return trip from Myrtle Beach, the group stopped at a flea market, where Wade and Jackson purchased pocketknives and BB guns that appeared to be real firearms. Cole admitted that she knew that Jackson, Wade, and Nixon were going to the victims’ home to steal things such as credit cards. Cole also admitted that she spent the victims’ money after the murders and impersonated Mrs. Sumner during the telephone call with Detective Meac-ham.
Codefendant Nixon was also arrested. Nixon revealed to law enforcement officers the location where the victims were buried, and on July 16, 2005, the victims’ bodies were discovered. Nixon testified that he understood that because of his guilty plea that he could receive a sentence between fifty-two years and life imprisonment without parole. Nixon understood that he would not be sentenced until after testifying against Wade. (Nixon had previously testified against Jackson.)
Dr. Anthony J. Clark, Medical Examiner for the Georgia Bureau of Investigation, performed autopsies on the bodies and testified that both of the victims died as a result of mechanical obstruction of the airways by dirt. Essentially, the victims were buried alive and asphyxiated from the dirt particles smothering their airway passages.
Cole testified on her own behalf. Her in-court testimony largely corroborated both her own previous statement to Detective Meacham and Nixon’s version of the events. Cole’s account differed from Nixon’s version, primarily in that Cole claimed that she thought the crime would be a *603 simple theft and that she did not knowingly participate in the robberies, kidnappings, or murders. Cole asserted that she did not know that the victims were in the trunk until she was following the Lincoln to the grave site and heard Jackson talking to Nixon over the Nextel radio phones. Cole stated that the purpose of taking the victims to the hole was to get the PIN numbers and that from her location at the road she could not see or hear what was happening at the grave site. Cole admitted to writing bad checks and testified that her codefendants “wouldn’t have had nothing if it wasn’t for my checking account.” Cole also admitted that she purchased Clorox and gloves after the murders.
On October 19, 2007, by special verdict, the jury found Cole guilty of two counts of first-degree murder, on both premeditation and felony-murder theories; two counts of kidnapping; and two counts of robbery.
During the penalty-phase proceedings, the State called two of the victims’ relatives, who gave victim-impact evidence. The defense presented several of Cole’s relatives and friends, who testified that Cole was of good character. Three correctional officers who previously had contact with Cole testified that Cole was helpful in jail and did not cause problems. Psychiatrist Dr. Earnest Miller testified on behalf of the defense. He testified that Cole suffered from poly-substance and alcohol abuse, chronic depression, and a personality disorder not otherwise specified. He also testified that Cole had witnessed abuse to family members and pets, had been sexually abused by her father, and had been in abusive relationships with two boyfriends. However, Dr. Miller testified that Cole was competent to proceed and that an insanity defense could not be supported. Further, he testified that at the time of the crimes, Cole knew right from wrong and that Cole has a high-average IQ.
The jury recommended death sentences for both murders, each by a nine-to-three vote. At the Spencer[2] hearing, the State called two of the victims’ relatives, who gave victim-impact evidence. The defense presented several of Cole’s relatives and friends who spoke of Cole’s good character. Ultimately, the trial court sentenced Cole to death for each murder, life imprisonment for each kidnapping, and fifteen years’ imprisonment for each robbery.
II. GUILT-PHASE CLAIMS
Regarding the guilt phase, Cole argues that the trial court erred in (A) admonishing defense counsel for a cross-examination question to the State’s witness, code-fendant Nixon, concerning the parameters of Nixon’s possible sentence under his plea agreement; and (B) admitting photographs showing Cole and codefendants Jackson and Wade partying in Myrtle Beach before the murders. In addition to these claims raised by Cole, we review the sufficiency of the evidence supporting Cole’s convictions. We conclude that Cole is not entitled to guilt-phase relief.
A. Trial Court’s Comment
Cole argues that the trial court improperly admonished defense counsel when defense counsel asked codefendant Nixon during cross-examination whether Nixon’s plea agreement allowed the court to impose a sentence of less than fifty-two years. The challenged comment of the trial court occurred at the conclusion of the following exchange:
Q [BY MR. TILL]: [Your lawyer] told you what that 52 years to life really means, didn’t he?
*604 A: Sir?
Q: He told you what that 52 years to life really meant, didn’t he?
A: Yes, sir.
Q: And Judge Weatherby the better you testify he could go down below that 52 years to life, can’t he?
MR. MIZRAHI: Objection, Your Honor.
THE COURT: That’s absolutely not the case, Mr. Till.
(Emphasis added.)
Because defense counsel did not object to the trial court’s comment, we will reverse only if the comment was fundamental error. Jones v. State, 612 So.2d 1370, 1373 (Fla.1992) (“The contemporaneous objection rule applies to such comments, ... and an appellate court will not reverse in the absence of an objection unless the comment is so prejudicial as to be fundamental error.”). Fundamental error is “error that ‘reaches down into the validity of the trial itself to the extent that a verdict of guilty could not have been obtained without the assistance of the alleged error.’ ” Brooks v. State, 762 So.2d 879, 899 (Fla.2000) (quoting McDonald v. State, 743 So.2d 501, 505 (Fla.1999)). We conclude that even if the trial court’s comment was error,[3] it was not fundamental error.
In Jones, we held that the trial court’s improper comment to the State’s witness, “That’s correct, according to the previous witness, Mr. Stout,” was not fundamental error. 612 So.2d at 1373. The Court emphasized that the trial court’s comment pertained to only a minor detail of the codefendant’s testimony. Thus, the error did not affect the validity of the trial. See id. at 1373-74, 1376; see also Harmon v. State, 527 So.2d 182, 186 (Fla.1988) (holding no fundamental error where trial court commented four times on a State witness’s credibility during defense counsel’s attempt to impeach the witness, including one comment that “the statements seemed consistent to [the trial court] also, but that it was for the jury to decide”).
In this case, soon after the trial court made the comment at issue, defense counsel raised the issue of Nixon’s plea agreement at a bench conference on an unrelated matter. The trial court and the State acknowledged that Nixon’s plea agreement did allow the trial court to impose a sentence below fifty-two years. The trial court then allowed defense counsel to question Nixon again on the terms of Nixon’s plea agreement, which enabled defense counsel to dispel any confusion or prejudice that the jury otherwise would have had toward the defense as a result of the trial court’s comment.
B. Admission of Photographs
Cole argues that the trial court erred in admitting photographs showing Cole, Jackson, Wade, and another female partying in Myrtle Beach before the murders. Cole asserts that the photographs were irrelevant and prejudicial. We disagree.
The photographs at issue primarily show the group in a limousine holding champagne glasses and posing with what appears to be money, including one photograph showing Cole with money in her mouth. Additionally, one photograph shows the group sitting on the hood of what appears to be the rented Mazda RX-8. Other photographs show the group and *605 Cole individually on what appears to be a hotel balcony.
“The test for the admissibility of photographic evidence is relevance, not necessity.” Mansfield v. State, 758 So.2d 636, 648 (Fla.2000). A court’s ruling on the relevancy of evidence is reviewed for an abuse of discretion. Belcher v. State, 961 So.2d 239, 253-54 (Fla.2007). The trial court did not abuse its discretion in allowing the admission over objection of the Myrtle Beach photographs. The photographs were relevant to the jury’s full understanding of the events surrounding the crimes. They enabled the jury to see the relationship that Cole had with her codefendants and Cole’s potential motive— financial gain — for planning and participating in the crimes against the victims. See Craig v. State, 510 So.2d 857, 863 (Fla.1987) (“While evidence of motive is not necessary to a conviction, when it is available and would help the jury to understand the other evidence presented, it should not be kept from them merely because it reveals the commission of crimes not charged.”).
Further, the photographs’ probative value was not substantially outweighed by the danger of unfair prejudice or misleading the jury. See § 90.403, Fla. Stat. (2007). Importantly, Cole does not specifically assert how she was unfairly prejudiced, except by claiming that during closing argument the prosecutor emphasized the photographs in a manner that misled the jury to believe that Cole murdered the victims so that she could afford to continue the expensive lifestyle depicted in the photographs. We have consistently upheld the admission of even gruesome victim photographs when the photographs corroborate other evidence or the photographs are independently relevant. Marquard v. State, 850 So.2d 417, 427 (Fla.2002); Czubak v. State, 570 So.2d 925, 928 (Fla.1990). The photographs at issue here — which merely show a group of young adults partying at the beach — present less danger of unfair prejudice than photographs that we have held admissible under section 90.403, Florida Statutes.
C. Sufficiency of the Evidence
Cole does not challenge the sufficiency of the evidence supporting her convictions. However, in all direct appeals where the death penalty has been imposed, we review the record to determine whether the evidence is sufficient to support the murder conviction. Fla. R.App. P. 9.142(a)(6); see also Deparvine, 995 So.2d at 351, 376 (Fla.2008) (“[T]his Court will ‘independently review the evidence to determine whether sufficient evidence exists to support a first-degree murder conviction.’ ” (quoting Snelgrove v. State, 921 So.2d 560, 570 (Fla.2005))). We find that sufficient evidence exists to support Cole’s first-degree murder convictions for the murders of both Mr. and Mrs. Sumner.
Among other evidence, the jury heard codefendant Nixon’s' testimony, Cole’s taped interview with Detective Meacham, and Cole’s in-court testimony. Nixon testified that Cole knew that the victims were going to be killed before the crimes took place and that Cole was as involved as Jackson, Wade, and Nixon in planning the crimes. Cole admitted that before the murders, she purchased plastic wrap and duct tape, held the flashlight while her codefendants dug the large hole where the victims were subsequently buried, and drove the codefendants to the victims’ home and grave site. The evidence shows that after the murders, Cole purchased Clorox and gloves; went back to the victims’ home and stole their computer; posed as Mrs. Sumner on the phone with Detective Meacham; drove Jackson to ATM machines for him to withdraw money from the victims’ bank account; pawned *606 the victims’ belongings; and participated in spending the victims’ money.
From the evidence presented, the jury reasonably could have concluded that Cole formed a conscious purpose to participate in killing the victims. See Ferrell v. State, 686 So.2d 1324, 1329 (Fla.1996) (“While Ferrell may not have actually pulled the trigger, the evidence establishes that he played [an] integral part in these crimes and in actually luring the victim to his death. Thus, at a minimum, he is guilty as a principal under the statute.”).
III. PENALTY-PHASE CLAIMS
As discussed above, the jury recommended two death sentences by nine-to-three votes, and the trial court followed the jury’s recommendation. In sentencing Cole, the trial court found seven aggravating factors applicable to both murders: (1) Cole was previously convicted of another capital felony, based on the contemporaneous first-degree murders of the victims; (2) the murders were committed in the course of kidnappings; (3) the capital felonies were especially heinous, atrocious, or cruel (HAC); (4) the capital felonies were committed in a cold, calculated, and premeditated manner (CCP); (5) the capital felonies were committed for financial gain; (6) the capital felonies were committed to avoid or prevent a lawful arrest; and (7) the victims were particularly vulnerable due to advanced age or disability.
The trial court also found statutory and nonstatutory mitigating factors. The trial court assigned “some weight” to both the “no significant history of prior criminal activity” mitigating factor and the age at the time of the crime mitigating factor (Cole was twenty-three years old). With respect to the minor participant mitigating factor, the trial court’s order states, “While this defendant might not have turned the spade onto the Sumners, this Court cannot say that her participation was relatively minor. Accordingly, this matter is afforded little weight.” With respect to the “substantial domination” mitigating factor, after noting that there was “some evidence of this mitigator in the record” — i.e., the defendant’s own testimony — the trial court concluded that “given the totality of the circumstances, the Court cannot afford this matter much weight.” The trial court stated that “the evidence tends to indicate that [Cole] knew exactly what she was doing and participated without hesitation.”
The trial court grouped the numerous nonstatutory mitigating factors into six categories. The six categories include: (1) Cole had minimal involvement in the criminal activity (some weight); (2) Cole had psychological circumstances that included lack of self-confidence, low self-esteem, and feelings of inadequacy (little weight); (3)Cole had been a model prisoner (some weight); (4) Cole’s family history included growing up without a father, being raised by a working mother, caring for her brothers and terminally ill father, being a victim of domestic violence, having the capacity to form loving relationships, and having the love and support of her family (some weight); (5) Cole had substance abuse problems (little weight); and (6) Cole was of good character (some weight).
Ultimately, the trial court concluded that “the aggravating circumstances far outweigh[ed] the mitigating circumstances.”
Cole argues that the trial court erred in (A) instructing the jury on and in finding the avoid-arrest aggravating factor; (B) instructing the jury on and in finding the HAC aggravating factor; and (C) imposing death sentences that are disparate compared to codefendant Nixon’s sentence of forty-five years. Cole also contends that Florida’s death penalty scheme is unconstitutional under Ring v. Arizona, 536 U.S. *607 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002). In addition to considering the issues that Cole raises, we review the record to determine whether the death sentences are proportionate. See Fla. R.App. P. 9.142(a)(6). We conclude that Cole is not entitled to penalty-phase relief.
A. Avoid-Arrest Aggravator
Cole argues that the trial court erred in instructing the jury on and in finding the avoid-arrest aggravating factor. She claims that the facts support the conclusion that the dominant motive for the murders was to facilitate theft rather than to avoid arrest. We conclude that the trial court did not err.
“[T]o establish the avoid arrest aggravating factor where the victim is not a law enforcement officer, the State must show beyond a reasonable doubt that the sole or dominant motive for the murder was the elimination of a witness.” Reynolds v. State, 934 So.2d 1128, 1156 (Fla.2006) (quoting Bell v. State, 841 So.2d 329, 336 (Fla.2002)). However, “[e]ven without direct evidence of the offender’s thought processes, the arrest avoidance factor can be supported by circumstantial evidence through inference from the facts shown.” Id. at 1157 (alteration in original) (quoting Swafford v. State, 533 So.2d 270, 276 n. 6 (Fla.1988)); see also Looney v. State, 803 So.2d 656, 677 (Fla.2001) (“This Court has also said [the avoid-arrest] factor may be proved by circumstantial evidence from which the motive for the murders may be inferred.”). Further, “the avoid arrest ag-gravator is proper where ‘the victim is transported to another location and then killed.’ ” Jones v. State, 748 So.2d 1012, 1027 (Fla.1999) (quoting Hall v. State, 614 So.2d 473, 477 (Fla.1993)).
In Zack v. State, 753 So.2d 9, 20 (Fla.2000), we held that the avoid-arrest aggravating factor was improperly found when the facts indicated that Zack committed the murder at issue during the course of committing multiple crimes over a period of several days and in multiple cities. We explained that
[t]he record suggests only that [the victim’s] murder was part of Zack’s premeditated plan to kill her and take her car and possessions. While it is true that Zack did not have to murder [the victim] to accomplish his monetary goals, this alone does not make Zack’s dominant motive the desire to avoid arrest.

Id.

In Buzia v. State, 926 So.2d 1203, 1210 (Fla.2006), we distinguished Zack and emphasized that unlike Zack, Buzia was not on a “crime-riddled journey.” Buzia knew his victims, he easily subdued the victims, and the victims posed no immediate threat to Buzia. Id. at 1206, 1211. Thus, there was little reason for Buzia to kill the victims other than to avoid arrest. Id. at 1211. Similarly, in Looney, we held that the trial court properly found the avoid-arrest aggravating factor where Looney and his codefendants entered the victims’ home, subdued the victims, and then killed the victims after realizing that the victims knew a codefendant. 803 So.2d at 676-78. We emphasized that Looney and his eode-fendants were able to leave the premises without injuring or killing the victims because they had access to the victims’ vehicle and the victims were immobilized and unable to resist. Thus, there was no reason for Looney and his codefendants to kill the victims other than to avoid arrest. Id. at 677-78; see also Hoskins v. State, 965 So.2d 1, 20 (Fla.2007) (holding that avoid-arrest aggravator was supported by fact that defendant could have left elderly victim, who had been bound and gagged, without killing her); Thompson v. State, 648 So.2d 692, 695 (Fla.1994) (upholding the avoid-arrest aggravating factor where *608 defendant had little reason to kill the victims — other than to eliminate witnesses— after obtaining the victims’ money).
In the instant case, the transportation of the victims to the grave site in Georgia points to avoiding arrest as the sole or dominant motive for the murders. See Jones, 748 So.2d at 1027. In addition, like those in Buzia and Looney and unlike those in Zack, the crimes were not part of a “crime-riddled journey.” Rather, Cole and her codefendants specifically targeted the victims. As we held in Buzia and Looney, if Cole and her codefendants’ dominant or sole motives were truly for pecuniary gain, rather than to avoid arrest, there would have been no reason to murder the victims after stealing items from the victims’ home and especially no reason to murder them after obtaining the victims’ PIN numbers at the grave site. The victims were in particularly poor health and could not have posed any danger to the codefendants at either the victims’ home or the grave site. The codefendants had access to the victims’ car while at the victims’ home and could have left the victims without any transportation in rural South Georgia. Competent, substantial evidence supports the trial court’s finding of the avoid-arrest aggravating factor.
B. Especially Heinous, Atrocious, or Cruel Aggravator
Cole argues that the trial court erred in instructing the jury on and in finding the HAC aggravating factor. She claims that although the murders did qualify as HAC, the aggravating factor could not be vicariously applied to her based on the manner of death that her codefendants chose. We agree but conclude that this error was harmless beyond a reasonable doubt.
The standard of review applicable to whether a trial court properly found an aggravating factor is “whether competent, substantial evidence supports the trial court’s finding.” Conde v. State, 860 So.2d 930, 953 (Fla.2003). The standard of review applicable to whether the trial court properly instructed the jury to consider an aggravating factor is whether the “evidence adduced at trial is legally sufficient to support a finding of that aggravating circumstance.” Davis v. State, 2 So.3d 952, 962 n. 4 (Fla.2008) (quoting Ford v. State, 802 So.2d 1121, 1133 (Fla.2001)), cert. denied, — U.S. -, 129 S.Ct. 2872, 174 L.Ed.2d 585 (2009).
We have upheld the application of HAC to defendants who did not directly cause the victim’s death where the defendant was particularly physically involved in the events leading up to the victim’s murder. See Cave v. State, 727 So.2d 227, 229 (Fla.1998) (holding that application of HAC to nontriggerman defendant was proper where defendant removed victim from convenience store at gunpoint, placed victim in car’s backseat with codefendant, heard victim plead for her life during the fifteen-to eighteen-minute ride to isolated area, removed victim from car, and turned victim over to codefendant who killed victim); Copeland v. State, 457 So.2d 1012, 1015, 1019 (Fla.1984) (holding that application of HAC to nontriggerman defendant was proper where defendant confronted victim at gunpoint, kidnapped victim, and raped victim before the codefendant murdered the victim).
However, this case is more similar to Omelus v. State, 584 So.2d 563 (Fla.1991), and its progeny. In Omelus, we held that application of HAC was improper where the defendant was not the actual killer— even though he had hired the killer — because there was no evidence that the defendant knew how the killer would carry out the murder. Id. at 566; see also Williams v. State, 622 So.2d 456, 463 (Fla.1993) (holding that HAC “cannot be ap *609 plied vicariously, absent a showing by the State that the defendant directed or knew how the victim would be killed”); Archer v. State, 613 So.2d 446, 448 (Fla.1993) (“[A] defendant who arranges for a killing but who is not present and who does not know how the murder will be accomplished cannot be subjected vicariously to the heinous, atrocious, or cruel aggravator.”).
More recently, in Perez v. State, 919 So.2d 347, 378 (Fla.2005), we held that HAC was erroneously vicariously applied to Perez, despite overwhelming evidence showing that Perez was involved in preparation for at least a robbery, in covering up the murder, and in pawning the victim’s belongings. Perez’s bloody shoeprint was next to the victim’s body; his own statement directly placed him at the crime scene; and he admitted to disposing of his shoes on the night of the crime because there was blood on them. Id. at 370. Additionally, Perez had cut the victim’s phone lines and disabled the security lights before the murder. Id. Perez admitted that he helped dispose of evidence, including the murder weapon, and that he pawned items taken during the crime. Id. The medical examiner’s evidence showed that the victim had been stabbed at least ninety-four times. Id. The only eyewitness testimony presented at trial was Perez’s statement in which he never admitted striking the victim and consistently stated that the codefendant committed the murder of his own accord and without prior discussion with or notice to Perez. Based on this record, we concluded:
Given the trial court’s failure to make the findings required by Omelus to apply the HAC aggravator vicariously to Perez, and the lack of any evidence establishing that Perez directed or otherwise knew that Martin would be killed or the manner of death, we conclude that the trial court erred in applying the HAC aggravator to Perez. Although the record clearly demonstrates that the manner in which Susan Martin was murdered may qualify as HAC under our previous case law, we conclude that the evidence does not support the application of that aggravating circumstance ■vicariously to Perez under the only evidence in this record.
Id. at 381.
In this case, the evidence establishes that Cole knew that the victims would be killed and that Cole planned and prepared for the victims’ murders and attempted to cover up the murders afterward. As in Omelus and Perez, however, there is no evidence that Cole knew that her codefen-dants would kill the victims in the manner that they did — by burying them alive. The only evidence indicating the manner of death contemplated by Cole and her code-fendants was Nixon’s testimony that Jackson stated that Jackson would kill the victims at the grave site by lethal injection. The evidence shows that Cole was never near the victims during the crimes and that she was not at the grave site when her codefendants buried the victims alive. We conclude that the trial court erred in instructing the jury on and in finding HAC because there is no competent, substantial evidence to support a finding that Cole either directed her codefendants to bury the victims alive or knew that her codefen-dants would kill the victims by burying them alive.
“When this Court strikes an aggravating factor on appeal, ‘the harmless error test is applied to determine whether there is no reasonable possibility that the error affected the sentence.’ ” Williams v. State, 967 So.2d 735, 765 (Fla.2007) (quoting Jennings v. State, 782 So.2d 853, 863 n. 9 (Fla.2001)). We conclude that there is no reasonable possibility that the error contributed to the sentence. *610 Without the HAC aggravating factor, there are six remaining valid aggravators. Moreover, the trial court found minimal mitigation and concluded that “the aggravating circumstances far outweigh the mitigating circumstances.” When the remaining six aggravating factors — including CCP and prior violent felony, aggravators that we have acknowledged as particularly weighty — are compared to the insubstantial mitigation, there is no reasonable possibility that the jury’s recommendation or the trial court’s sentencing decision would have been different if HAC had not been considered. See Chamberlain v. State, 881 So.2d 1087, 1109 (Fla.2004) (“CCP and pri- or violent felony conviction are considered among the more serious aggravating circumstances.”). We have determined the striking of an aggravating factor to be harmless in similar cases. For example, we concluded that the trial court’s erroneous finding of HAC was harmless where the cases involved five of the six valid aggravating factors present here and similar minimal mitigation. See Knight v. State, 746 So.2d 428, 485-36 (Fla.1998); Hartley v. State, 686 So.2d 1316, 1323-24 (Fla.1996). We have also determined trial courts’ erroneous findings of other aggravating factors to be harmless where there was valid aggravation and mitigation similar to that present here. See Chamberlain, 881 So.2d at 1107 (holding trial court’s erroneous finding of CCP harmless because four aggravating factors remained); Sireci v. Moore, 825 So.2d 882, 887 (Fla.2002) (holding that even if the evidence, was insufficient to support CCP, such error would be harmless because four aggravating factors remained); Zack v. State, 753 So.2d 9, 20 (Fla.2000) (holding trial court’s erroneous finding of avoid arrest harmless because four aggravating factors remained).
C. Disparate Sentencing
Cole contends that her two death sentences are disparate compared to code-fendant Nixon’s sentence. Cole’s argument is without merit. Nixon pleaded guilty to two counts of second-degree murder for the victims’ deaths and ultimately received two concurrent sentences of forty-five years’ imprisonment. “[I]n instances where the codefendant’s lesser sentence was the result of a plea agreement or prosecutorial discretion, this Court has rejected claims of disparate sentencing.” England v. State, 940 So.2d 389, 406 (Fla.2006) (quoting Kight v. State, 784 So.2d 396, 401 (Fla.2001)); see also Smith v. State, 998 So.2d 516, 528 (Fla.2008) (rejecting claim that death sentence was disparate to codefendant who pleaded guilty and received a life sentence).
D. Proportionality
Cole does not argue that her sentences are disproportionate compared to other death sentences in Florida. Nevertheless, we have a duty to conduct a “proportionality review to prevent the imposition of ‘unusual’ punishments contrary to article I, section 17 of the Florida Constitution.” Simmons v. State, 934 So.2d 1100, 1122 (Fla.2006); see also Fla. R.App. P. 9.142(a)(6). We conduct a qualitative review of the totality of the circumstances of the case and compare the case with other capital cases.
In this case, the trial court imposed death sentences for both Mr. and Mrs. Sumner’s murders. In its sentencing order, the trial court found that seven aggravating factors were proven beyond a reasonable doubt. Although we have determined that the HAC aggravating factor was not established, we conclude that the remaining six aggravators, weighed against the statutory and nonstatutory mitigating factors, amply support the im *611 position of the two death sentences. We have previously upheld the death penalty as proportionate in cases involving double murders with aggravation and mitigation similar to the factors present in Cole’s case. For example, in Wright v. State, 19 So.32d 277 (Fla.2009), involving the murders of two victims, we held that the trial court properly found four aggravating factors — prior violent felony, pecuniary gain, CCP, and avoid arrest — three statutory mitigating factors, and several nonstatuto-ry mitigating factors. After considering the totality of the circumstances, we determined that Wright’s death sentences were proportionate. Id.; see also Pearce v. State, 880 So.2d 561, 577 (Fla.2004) (upholding death sentence in case with three aggravating factors — CCP, prior violent felony, and murder committed during a kidnapping — no statutory mitigating factors, and a number of nonstatutory mitigating factors); Spann v. State, 857 So.2d 845, 860 (Fla.2003) (upholding death sentence in case with five aggravating factors — prior violent felony, murder in the course of a felony (kidnapping), avoid arrest, pecuniary gain, and CCP — no statutory mitigating factors, and six nonstatuto-ry mitigating factors). Thus, we conclude that under the totality of the circumstances, the sentences in the instant case are proportionate.
E. Ring Claim
Finally, Cole argues that Florida’s death penalty scheme is unconstitutional under Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002). This Court has, however, repeatedly rejected claims based on Ring where the prior-violent-felony aggravator is present. Cole’s case involves this aggravator. See Jackson, 18 So.3d at 1025 n. 6 (rejecting Jackson’s Ring argument because Jackson had a pri- or violent felony conviction — the contemporaneous murders of Mr. and Mrs. Sumner); Frances v. State, 970 So.2d 806, 822-23 (Fla.2007) (rejecting Ring argument when the death sentence was supported by prior-violent-felony aggravating factor based on contemporaneous murder convictions), cert. denied, 553 U.S. 1039, 128 S.Ct. 2441, 171 L.Ed.2d 241 (2008).
IY. CONCLUSION
In accord with the above analysis, we affirm Cole’s convictions and sentences.
It is so ordered.
QUINCE, C.J., and PARIENTE, LEWIS, POLSTON, LABARGA, and PERRY, JJ., concur.
CANADY, J., concurs in result with an opinion.

. Jackson and Wade were tried separately, and each was convicted of two counts of first-degree murder and received two death sentences. We have affirmed Jackson’s convictions and death sentences. Jackson v. State, 18 So.3d 1016 (Fla.2009), cert. denied, - U.S. -, 130 S.Ct. 1144, — L.Ed.2d - (2010). Wade’s direct appeal is currently before this Court. Wade v. State, No. SC08-573 (oral argument heard Nov. 4, 2009). Nixon pleaded guilty to two counts of second-degree murder. After testifying against Jackson, Cole, and Wade, Nixon received two concurrent sentences of forty-five years' imprisonment.

. Spencer v. State, 615 So.2d 688 (Fla.1993).

. While we do not decide whether the comment was erroneous, we note that although the import of the trial judge’s interjection is not clear, it may well have been made to rebut the suggestion that the sentence imposed by the judge would be influenced by how favorable Nixon's testimony was to the State’s case rather than to assert that a sentence below fifty-two years could not be imposed.