# Supreme Court of Florida

_____

No. SC13-2245
_____

**TIFFANY ANN COLE,**
Appellant,

vs.

**STATE OF FLORIDA,**
Appellee.

[June 29, 2017]

PER CURIAM.

Tiffany Ann Cole, an inmate under sentences of death, appeals an order of

the circuit court denying her motion for postconviction relief filed under Florida

Rule of Criminal Procedure 3.851.[1]  We have jurisdiction.  See art. V, § 3(b)(1),

Fla. Const.  For the reasons that follow, we affirm the postconviction court's denial

---

1. Two of Cole's codefendants, Michael James Jackson and Alan Lyndell Wade, were also sentenced to death.  Wade v. State, 41 So. 3d 857 (Fla. 2010), cert. denied, 562 U.S. 1183 (2011); Jackson v. State, 18 So. 3d 1016 (Fla. 2009), cert. denied, 558 U.S. 1151 (2010).  They have since been granted new penalty phase proceedings.  State v. Jackson, No. 16-2005-CF-10263-CXXX-MA (Fla. 4th Jud. Cir. Jun. 9th, 2017) (Postconviction Order); State v. Wade, No. 16-2005-CF-10263-BXXX-MA (Fla. 4th Jud. Cir. May 1, 2017) (Postconviction Order).

of relief for a new guilt phase but grant Cole a new penalty phase based on the United States Supreme Court's opinion in <u>Hurst v. Florida</u> (<u>Hurst v. Florida</u>), 136 S. Ct. 616 (2016), and this Court's opinion on remand in <u>Hurst v. State</u> (<u>Hurst</u>), 202 So. 3d 40 (Fla. 2016), <u>cert. denied</u>, No. 16-998, 2017 WL 635999 (U.S. May 22, 2017).

## I. BACKGROUND

In 2007, "Cole was convicted of two counts of first-degree murder, two counts of kidnapping, and two counts of robbery for the 2005 murders of James and Carol Sumner." <u>Cole v. State</u>, 36 So. 3d 597, 599 (Fla. 2010). On appeal, this Court set out the facts of the crimes:

> The evidence presented at trial established that on the night of July 8, 2005, Cole and codefendants Michael James Jackson, Bruce Kent Nixon, Jr., and Alan Lyndell Wade robbed, kidnapped, and murdered the victims. At trial, the evidence primarily consisted of codefendant Nixon's testimony, Cole's taped interview with Homicide Detective David Meacham of the Jacksonville Sheriff's Office (JSO), and Cole's in-court testimony.
>
> Cole was the only codefendant who knew the victims. The victims were friends with and previous neighbors of Cole's father before the victims moved from the Charleston, South Carolina, area to Jacksonville, Florida. The victims also had recently sold Cole a vehicle and informed her that she was welcome at their home if she was ever in Jacksonville. The plan to rob and murder the victims evolved from knowledge that Cole already had about the victims and that she obtained from the victims in the weeks prior to the crimes.
>
> Cole and Jackson met and became involved in a personal relationship two months before the crimes. During that two-month period, Cole and Jackson often traveled together. In June 2005, Cole and Jackson went to Jacksonville, Florida, to visit Jackson's friend Wade. During this visit, Cole contacted the victims, and Cole and

- 2 -

Jackson stayed one night at the victims' home. During the visit, Mrs. Sumner informed Cole that she and Mr. Sumner had recently sold their home near Charleston, South Carolina, and had profited $99,000. Following the initial trip to Jacksonville and additional trips between Charleston and Jacksonville, Cole, Jackson, Wade, and Wade's friend Nixon developed a plan to rob the victims. At the time of the crimes, Cole and Jackson were twenty-three years old and Wade and Nixon were eighteen years old. The victims were in their early sixties but were both in poor health and especially frail.

In preparation for the robbery, Nixon stole four shovels to dig a hole. From a rental agency in South Carolina, Cole had previously rented a Mazda RX-8, which she used to transport the group. Two days before the murders, Cole, Jackson, and Wade picked Nixon up in the Mazda. The group drove around until they selected a remote location—in Georgia, just across the Florida state line—to dig a large hole. While Cole held a flashlight, Jackson, Wade, and Nixon dug the hole, which was approximately four feet deep and six feet square. The group left the shovels at the hole when they completed the excavation. Nixon testified that in the two days after digging the hole, the foursome drove around discussing "what [they] were going to do" and "how [they] were going to do it." He stated that the foursome planned the robbery together and that Cole was the one who knew the victims and who "set everything up." The group initially did not know whether they would enter the Sumners' home while the victims were home and kidnap the victims or wait until the victims were away from their home. Nixon testified that Cole knew when the victims would be away from their home for a doctor's appointment. The foursome ultimately decided that they would kill the victims. Nixon testified that Jackson informed the others that he would kill the victims at the grave site by injecting them with a lethal dose of medication.

On the night of the crimes, July 8, 2005, Cole and her codefendants purchased duct tape and plastic wrap. Cole wrote a personal check for these items. Later that night, Cole drove the foursome to the victims' home. Initially, Cole and Jackson remained outside in the rented Mazda. Wade and Nixon knocked on the door, and when Mrs. Sumner responded, Wade asked to use her telephone. After Mrs. Sumner allowed Wade and Nixon into her home, Wade ripped the telephone cord from the wall. Nixon held the victims at gunpoint with a toy gun, took the victims to a bedroom, and bound

them with duct tape. After Wade and Nixon contacted Jackson through Nextel two-way radio phones—which the group used to communicate throughout the course of the crimes—Jackson entered the victims' home. Jackson and Wade then searched the victims' home for bank account records. Cole drove down the street and waited in the Mazda. Eventually, the victims were taken to their garage and forced into the trunk of their Lincoln Town Car. Cole drove back to the victims' home in the Mazda after Jackson called her. Jackson placed a trash bag containing some of the victims' belongings in the Mazda's trunk and got into the Mazda. Wade and Nixon then drove the victims' Lincoln to a gas station to refuel it, and Cole and Jackson followed in the Mazda.

The foursome, with the victims in the Lincoln's trunk, then drove to the remote Georgia location where they had previously dug the large hole. Upon arrival, Cole remained with the Mazda at the edge of the road, while her codefendants drove the Lincoln into the woods to the hole. At some point, Nixon joined Cole at the road. The evidence shows that only Jackson and Wade were present at the hole when the victims were put into the hole and buried alive. When Jackson returned from the woods to the Mazda, Jackson had the personal identification number (PIN) for the victims' automated teller machine (ATM) card. The foursome drove both cars from the grave site to Sanderson, Florida, where they wiped down the Lincoln and abandoned it. The foursome then left in the Mazda, with Cole driving.

The group next stopped at an ATM in Jacksonville, from which Jackson withdrew money from the victims' bank account. The group then retired to a motel. Later that night, after purchasing Clorox and gloves, Cole and Wade returned to the victims' home. The evidence shows that at that time Cole and Wade took the victims' computer from the home. Subsequently, Cole pawned Mrs. Sumner's rings and the victims' computer.

On July 10, 2005, Rhonda Alford, Mrs. Sumner's daughter, reported to the JSO that she had been unable to contact the victims for several days. That same day, Officer Vindell Williams of JSO spotted a Lincoln Town Car in Sanderson that was later determined to be the victims' Lincoln. On July 12, 2005, Homicide Detective David Meacham of the JSO responded to the victims' home to investigate. In their home, he saw a bank statement that showed a large sum of money in the victims' bank account. After contacting the bank, he

learned that during the past few days there had been an unusually large amount of ATM withdrawals—totaling several thousand dollars—from the victims' account.

Later on July 12, Detective Meacham learned that someone claiming to be Mr. Sumner had contacted the JSO. Detective Meacham returned the call. The person claiming to be Mr. Sumner was later identified as codefendant Jackson. As Mr. Sumner, Jackson asked Detective Meacham to assist him in accessing his bank account; by that time Jackson was apparently having trouble accessing the account. As Mr. Sumner, Jackson explained that he and Mrs. Sumner had left town quickly to attend Mrs. Sumner's sister's funeral in Delaware. When Detective Meacham asked to speak to Mrs. Sumner, Cole posed as Mrs. Sumner and pretended to be tired and ailing. Detective Meacham contacted the bank and requested that it continue to allow access to the victims' account so that Detective Meacham could continue his investigation.

Since Detective Meacham suspected that he was not actually speaking to the Sumners, he contacted United States Marshal David Alred to assist in tracking the cellular telephone number used by the callers. The cell phone was registered to Jackson and had been used near the victims' home around the time of the victims' abduction. The cell phone records also showed calls to a South Carolina rental car company. Detective Meacham contacted the company, which indicated that it had rented a silver Mazda RX-8 to Cole and that the car was overdue. Using the rental car global positioning system, law enforcement officers determined that the Mazda had been within blocks of the victims' home on the night of the murders.

As Detective Meacham continued to investigate the victims' disappearance, Jackson continued to withdraw money from the victims' bank account. Jackson made multiple ATM withdrawals from the victims' bank account between the early hours of July 9 and the night of July 13, 2005. Photo surveillance captured Jackson making several of these withdrawals. Cole drove Jackson to the ATM machines in the rented Mazda; the Mazda could be seen in some of the surveillance photographs.

Detective James Rowan of the North Charleston Police Department testified that he found the rented Mazda in the parking lot of an abandoned office building near the rental company. Detective Rowan went to Cole's residence near Charleston, South Carolina, and David Duncan, Cole's brother, led Detective Rowan and other officers

to the nearby Best Western Hotel where Cole, Jackson, and Wade were staying. Two rooms were rented to Cole. At the motel, officers found and arrested Cole, Jackson, and Wade. The police obtained a search warrant for the motel rooms. In the motel room where Cole and Jackson were staying, police found the victims' South Carolina driver licenses, credit cards, checkbook, mail, and papers indicating the victims' America Online account and passwords, social security numbers, and birthdates. In the same room, police found what appeared to be a new laptop computer and bags of new merchandise. Additionally, officers found photographs showing Cole, Jackson, Wade, and another female, who was uninvolved in the crimes, "partying" in Myrtle Beach before the crimes. The victims' ATM card was found in Jackson's back pocket. In the motel room where Wade was staying, police found a key ring that belonged to the victims. The victims' coin collection was found in the trunk of Cole's car.

Detective Meacham testified that he drove to Charleston immediately after learning that Cole, Jackson, and Wade were apprehended. A recording of Detective Meacham's July 14, 2005, interview of Cole was played for the jury. In it, Cole admitted that before the crimes she had gone to Myrtle Beach with Jackson, Wade, and another female uninvolved in the crimes. Cole stated that the group stayed in a hotel room, "[s]pending money up there, partying up there." She stated also that on the return trip from Myrtle Beach, the group stopped at a flea market, where Wade and Jackson purchased pocketknives and BB guns that appeared to be real firearms. Cole admitted that she knew that Jackson, Wade, and Nixon were going to the victims' home to steal things such as credit cards. Cole also admitted that she spent the victims' money after the murders and impersonated Mrs. Sumner during the telephone call with Detective Meacham.

Codefendant Nixon was also arrested. Nixon revealed to law enforcement officers the location where the victims were buried, and on July 16, 2005, the victims' bodies were discovered. Nixon testified that he understood that because of his guilty plea that he could receive a sentence between fifty-two years and life imprisonment without parole. Nixon understood that he would not be sentenced until after testifying against Wade. (Nixon had previously testified against Jackson.)

Dr. Anthony J. Clark, Medical Examiner for the Georgia Bureau of Investigation, performed autopsies on the bodies and testified that both of the victims died as a result of mechanical obstruction of the airways by dirt. Essentially, the victims were buried alive and asphyxiated from the dirt particles smothering their airway passages.

Id. at 599-602 (alterations in original) (footnote omitted).

Cole testified during the guilt phase of her trial, which we summarized as follows:

Her in-court testimony largely corroborated both her own previous statement to Detective Meacham and Nixon's version of the events. Cole's account differed from Nixon's version, primarily in that Cole claimed that she thought the crime would be a simple theft and that she did not knowingly participate in the robberies, kidnappings, or murders. Cole asserted that she did not know that the victims were in the trunk until she was following the Lincoln to the grave site and heard Jackson talking to Nixon over the Nextel radio phones. Cole stated that the purpose of taking the victims to the hole was to get the PIN numbers and that from her location at the road she could not see or hear what was happening at the grave site. Cole admitted to writing bad checks and testified that her codefendants "wouldn't have had nothing if it wasn't for my checking account." Cole also admitted that she purchased Clorox and gloves after the murders.

Id. at 602-03.

At the penalty phase, the State presented victim impact evidence from two of the victims' relatives. The defense presented testimony from several of Cole's relatives and friends, three correctional officers, and psychiatrist Dr. Earnest Miller. Id. at 603.

The jury recommended that Cole be sentenced to death for each murder by a vote of nine to three, and after a Spencer v. State, 615 So. 2d 688 (Fla. 1993), hearing, the trial court sentenced Cole to death for each murder. Cole, 36 So. 3d at 603. The trial court found seven aggravating factors applicable to both murders: (1) Cole was previously convicted of another capital felony, based on the contemporaneous first-degree murders of the victims; (2) the murders were committed in the course of kidnappings; (3) the capital felonies were especially heinous, atrocious, or cruel (HAC); (4) the capital felonies were committed in a cold, calculated, and premeditated manner (CCP); (5) the capital felonies were committed for financial gain; (6) the capital felonies were committed to avoid or prevent a lawful arrest; and (7) the victims were particularly vulnerable due to advanced age or disability. Id. at 606.

The trial court also found four statutory mitigating factors—(1) no significant history of prior criminal activity; (2) age at the time of the crimes; (3) minor participant in the crimes; and (4) under substantial domination of another— and numerous nonstatutory mitigating factors. Id. "Ultimately, the trial court concluded that 'the aggravating circumstances far outweigh[ed] the mitigating circumstances.' " Id. (alteration in original). The trial court assigned "some weight" to both the age mitigator and the no-significant-history-of-prior-criminal-activity mitigator. Id. But the trial court determined that the minor-participant

- 8 -

mitigator should be "afforded little weight," and that the substantial domination mitigator could not be "afford[ed] . . . much weight." Id.

Cole raised six claims on direct appeal: (1) the trial court erred in admonishing defense counsel for a cross-examination question to the State's witness, codefendant Nixon, concerning the parameters of Nixon's possible sentence under his plea agreement; (2) the trial court erred in admitting photographs showing Cole and codefendants Jackson and Wade partying in Myrtle Beach before the murders; (3) the trial court erred in instructing the jury on and in finding the avoid-arrest aggravating factor; (4) the trial court erred in instructing the jury on and in finding the HAC aggravating factor; (5) the trial court erred in imposing death sentences that are disparate compared to codefendant Nixon's sentence of forty-five years; and (6) Florida's death penalty scheme is unconstitutional under Ring v. Arizona, 536 U.S. 584 (2002). Cole, 36 So. 3d at 603, 606-07. On review, this Court concluded that the trial court erred in instructing the jury on and in finding the HAC aggravator. Id. at 609. However, we concluded that this error was harmless beyond a reasonable doubt and affirmed Cole's convictions and sentences. Id. at 608-611.

In September 2011, Cole timely filed her motion for postconviction relief. In March 2012, Cole filed an amended motion for postconviction relief raising five claims: (1) trial counsel was ineffective during the guilt phase for failing to file a

motion to suppress the fruits of Cole's unlawful arrest and seizure; (2) trial counsel was ineffective during the guilt phase for failing to raise jurisdictional issues or moving to dismiss the indictment; (3) trial counsel was ineffective during the guilt and penalty phases for undue delay and consequential failure to develop a duress and mitigation defense; (4) trial counsel was ineffective for failing to identify, call, or prepare witnesses in the penalty phase; and (5) cumulative error requires a new penalty phase. The postconviction court held an evidentiary hearing regarding claims (3) and (4) on March 18-20, 2013. Numerous witnesses were presented during the three-day evidentiary hearing.

On October 16, 2013, the postconviction court entered an order denying relief on all of Cole's claims. State v. Cole, No. 16-2005-CF-10263-DXXX-MA (Fla. 4th Jud. Cir. Oct. 16, 2013) (Postconviction Order). On appeal, Cole argues that: (1) trial counsel[2] provided ineffective assistance during the guilt phase in failing to file a motion to suppress the fruits of Cole's unlawful arrest and seizure; (2) trial counsel provided ineffective assistance during the guilt and penalty phases for undue delay and consequential failure to develop a duress and mitigation defense; (3) trial counsel provided ineffective assistance in failing to identify, call, or prepare witnesses in the penalty phase; and (4) cumulative error requires a new

_____

2. Quentin Till and Greg Messore represented Cole at trial. Till primarily handled the guilt phase and Messore primarily handled the penalty phase.

penalty phase. This Court permitted Cole to file supplemental briefing after the United States Supreme Court issued its decision in Hurst v. Florida. Because we determine that Cole is entitled to a new penalty phase under Hurst v. Florida and Hurst, we address only Cole's guilt phase claims and none of the other penalty phase claims.

## II. ANALYSIS

### A. Ineffective Assistance of Guilt Phase Counsel Claims

### 1. Motion to Suppress

Cole claims that trial counsel Till was ineffective in the guilt phase for failing to file a motion to suppress the fruits of an unlawful arrest and seizure. Specifically, Cole argues that trial counsel was ineffective for failing to file a motion to suppress challenging: (1) the sufficiency of the affidavit under which police obtained a warrant to search her motel room and car; (2) her arrest; and (3) incriminating statements that she made following her arrest as being the product of her allegedly unlawful arrest.[3] As explained below, the postconviction court did not err in denying Cole's ineffective assistance of guilt phase counsel claim.

In order to obtain relief on a claim of ineffective assistance of counsel, "a defendant must establish deficient performance and prejudice." Gore v. State, 846

_____

3. Although Cole's trial counsel filed several motions to suppress and adopted her codefendants' motions to suppress, trial counsel did not make these specific arguments.

So. 2d 461, 467 (Fla. 2003). Under the first prong, "the defendant must show that . . . counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." Strickland v. Washington, 466 U.S. 668, 687 (1984). "[T]here is a strong presumption that counsel's performance was not deficient, and it is the defendant's burden to overcome this presumption." Conahan v. State, 118 So. 3d 718, 726 (Fla. 2013) (citing Strickland, 466 U.S. at 689-90). Moreover, "[a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Strickland, 466 U.S. at 689. Under the second prong, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694. "Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable." Id. at 687.

On July 14, 2005, law enforcement found and arrested Cole, Jackson, and Wade at a motel in North Charleston, South Carolina. See Cole, 36 So. 3d at 602. Cole was arrested following a protective sweep of her room. Law enforcement

- 12 -

obtained a search warrant for two motel rooms rented in the name of Cole and the 1997 Chevrolet Lumina parked on the property and registered to Cole. Officer James Rowan swore to an affidavit setting out the probable cause for the search. Officer Rowan began with some information about two missing persons, the Sumners, and the discovery of their car "in a wooded area 45 miles from their residence." He stated in the affidavit that "[i]nvestigators located shovels and duct tape within the vehicle when it was located." He then stated in the affidavit:

> Investigators further identified the victim's bankcard from Heritage Trust Federal Credit Union had been used since the couple had been missing. Investigators obtained video of the individual using the victim's card. The video showed a white male subject using the card to access the ATM to obtain money. The suspect was exiting a vehicle, which appeared to be a silver 2005 Mazda RX-8. Tiffany Cole rented a silver RX-8 from Triangle Rental Car in Charleston, S.C. Tiffany Cole failed to return the vehicle per the rental contract. A tracking device in the vehicle was checked by the rental company and revealed the vehicle had been in the vicinity the victim's vehicle was located in. Contact was made with Tiffany Cole's family at her known address in Ladson, S.C. Cole's brother took detectives to the location to be searched to locate Cole. Upon locating Cole she was found to be in the company of a white male matching the photographs of the individual using the victim's ATM card to make a cash withdrawal from an ATM in Jacksonville, and Charleston. Based on the information obtained by Det. Rowan, from other law enforcement officers, there is reason to believe that Cole and her accomplices may have caused harm to the victim[s] and have been using the victims['] financial resources without permission, and further that there may be evidence of the aforementioned crimes under the control of Cole and her accomplices within the locations to be searched.

During the execution of the search warrant, law enforcement found numerous items belonging to the victims in Cole's motel room and car including the victims'

South Carolina driver licenses, credit cards, checkbook, mail, coin collection, and papers indicating the victims' America Online account and passwords, social security numbers, and birthdates.  See id.

We conclude that Cole has failed to show that trial counsel was ineffective for failing to challenge the sufficiency of the affidavit under which police obtained a warrant to search her motel room and car.  "In determining whether probable cause exists to justify a search, the trial court must make a judgment, based on the totality of the circumstances, as to whether from the information contained in the warrant there is a reasonable probability that contraband will be found at a particular place and time."  Wade v. State, 156 So. 3d 1004, 1015 (Fla. 2014) (quoting Pagan v. State, 830 So. 2d 792, 806 (Fla. 2002)); see United States v. Grubbs, 547 U.S. 90, 95 (2006).  In this case, the search warrant was supported by information establishing a reasonable probability that contraband would be found in Cole's motel room and car.  The affidavit plainly contains information linking Cole to the rented Mazda RX-8, the missing victims' vehicle, a man matching the individual pictured using the victims' ATM card in Jacksonville and Charleston, and the locations to be searched.  Cole simply has not established how trial counsel could have demonstrated the warrant to be defective under such circumstances.

We further conclude that Cole has failed to show that trial counsel was ineffective for failing to challenge her arrest or any incriminating statements that

she made following her arrest. Cole's argument that the search was tainted because her arrest was illegal is a red herring. Law enforcement seized the evidence from her motel room and car during the search conducted under the search warrant, not during the protective sweep that followed Cole's arrest. Furthermore, no information derived from Cole after her arrest was included in the affidavit used to obtain the search warrant. In any event, there is no merit in the argument that counsel was ineffective for failing to challenge Cole's arrest or any incriminating statements that she made following her arrest. As the facts recounted above indicate, the arrest was more than adequately supported by probable cause.

## 2. Duress Defense

Cole claims that trial counsel Till and Messore were ineffective in the guilt phase for failing to adequately investigate and develop a duress defense. Specifically, Cole argues that, had trial counsel conducted a reasonable investigation of her background and psychological deficiencies, they would have been able to show that she was under duress and effectively under the control of her codefendants during the period surrounding the crimes.[4] As explained below, the postconviction court did not err in denying this claim.

---

4. In this case, "the jury found Cole guilty of two counts of first-degree murder, on both premeditation and felony-murder theories; two counts of kidnapping; and two counts of robbery." Cole, 36 So. 3d at 603. We note that "duress is not a defense to intentional homicide because 'duress will never justify

- 15 -

"Under Strickland, 'counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.' " Coleman v. State, 64 So. 3d 1210, 1217 (Fla. 2011) (quoting Strickland, 466 U.S. at 691). "[S]trategic decisions do not constitute ineffective assistance of counsel if alternative courses have been considered and rejected and counsel's decision was reasonable under the norms of professional conduct." Occhicone v. State, 768 So. 2d 1037, 1048 (Fla. 2000).

We conclude that Cole has failed to show that trial counsel were deficient in their investigation of a duress defense. Here, the record from the postconviction evidentiary hearing demonstrates that Till performed a reasonable investigation regarding such a defense. Till's evidentiary hearing testimony indicates that, prior to the guilt phase, Till hired an investigator to go to South Carolina to gather information, speak to Cole's family, and find possible witnesses for the defense. Till also obtained background information from Cole, scheduled depositions in South Carolina, engaged in discovery with the State, interviewed some of Cole's family members, observed the evidence introduced at codefendant Jackson's trial, and began to formulate possible defenses. Till made a reasonable strategic decision based on his investigation to argue to the jury that Cole did not knowingly

---

the killing of an innocent third party.' " Henry v. State, 613 So. 2d 429, 432 n.6 (Fla. 1992) (quoting Wright v. State, 402 So. 2d 493, 498 (Fla. 3d DCA 1981)).

participate in the murder or kidnapping of the victims rather than emphasize a duress defense.[5] Till chose not to focus on a duress defense at the guilt phase, in part, as a result of his conversations with Cole. Till also believed that the State's evidence related to Cole's conduct would overshadow the theory that Cole was under duress from her codefendants during the course of the criminal events and that he would lose credibility with the guilt phase jury if he focused on a duress defense. No further investigation was necessary under such circumstances.

Regardless, Cole could not demonstrate prejudice because there is no reasonable probability that the presentation of a more comprehensive duress defense would have created a different result at the guilt phase. "The evidence presented at trial established that on the night of July 8, 2005, Cole and codefendants Michael James Jackson, Bruce Kent Nixon, Jr., and Alan Lyndell Wade robbed, kidnapped, and murdered the victims." Cole, 36 So. 3d at 599.

> Among other evidence, the jury heard codefendant Nixon's testimony, Cole's taped interview with Detective Meacham, and Cole's in-court testimony. Nixon testified that Cole knew that the victims were going to be killed before the crimes took place and that Cole was as involved as Jackson, Wade, and Nixon in planning the crimes. Cole admitted that before the murders, she purchased plastic wrap and duct tape, held the flashlight while her codefendants dug the large hole where the victims were subsequently buried, and drove the codefendants to the victims' home and grave site. The evidence

---

5. Till requested a duress instruction at trial, which the trial court denied, and briefly suggested a possible duress defense to the jury during closing argument.

- 17 -

shows that after the murders, Cole purchased Clorox and gloves; went back to the victims' home and stole their computer; posed as Mrs. Sumner on the phone with Detective Meacham; drove Jackson to ATM machines for him to withdraw money from the victims' bank account; pawned the victims' belongings; and participated in spending the victims' money.

Id. at 605-06. Cole did not testify at trial that she acted under duress. Instead, "Cole claimed that she thought the crime would be a simple theft and that she did not knowingly participate in the robberies, kidnappings, or murders." Id. at 602-03. Moreover, the evidence presented at the postconviction evidentiary hearing does not undermine our confidence in the outcome.

## B. **Hurst v. Florida** and **Hurst**

During the pendency of Cole's appeal from the denial of her motion for postconviction relief, the United States Supreme Court issued its decision in Hurst v. Florida, in which it held that Florida's former capital sentencing scheme violated the Sixth Amendment because it "required the judge to hold a separate hearing and determine whether sufficient aggravating circumstances existed to justify imposing the death penalty" even though "[t]he Sixth Amendment requires a jury, not a judge, to find each fact necessary to impose a sentence of death." Hurst v. Florida, 136 S. Ct. at 619. On remand in Hurst we held that

> before the trial judge may consider imposing a sentence of death, the jury in a capital case must unanimously and expressly find all the aggravating factors that were proven beyond a reasonable doubt, unanimously find that the aggravating factors are sufficient to impose death, unanimously find that the aggravating factors outweigh the

mitigating circumstances, and unanimously recommend a sentence of death.

Hurst, 202 So. 3d at 57.

Hurst v. Florida and Hurst apply retroactively to defendants in Cole's position who were sentenced under Florida's former, unconstitutional capital sentencing scheme after the United States Supreme Court decided Ring in 2002. Mosley v. State, 209 So. 3d 1248, 1283 (Fla. 2016). And in light of the nonunanimous jury recommendation to impose the death sentences, it cannot be said that the failure to require a unanimous verdict as to each death sentence was harmless. See Franklin v. State, 209 So. 3d 1241, 1248 (Fla. 2016) ("In light of the non-unanimous jury recommendation to impose a death sentence, we reject the State's contention that any Ring- or Hurst v. Florida-related error is harmless."), petition for cert. filed, No. 16-1170 (U.S. Mar. 23, 2017). We therefore conclude that Cole is entitled to a new penalty phase.

### III. CONCLUSION

Based on the foregoing, we affirm the denial of Cole's postconviction guilt phase claims, vacate her death sentences, and remand for a new penalty phase under Hurst v. Florida and Hurst.

It is so ordered.

LABARGA, C.J., and PARIENTE, LEWIS and QUINCE, JJ., concur.
PARIENTE, J., concurs with an opinion.
LAWSON, J., concurs specially with an opinion.

CANADY, J., concurs in part and dissents in part with an opinion, in which POLSTON, J., concurs.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION, AND IF FILED, DETERMINED.

PARIENTE, J., concurring.

I agree with the majority's holding that Cole is entitled to Hurst[6] relief as a result of the nine to three jury recommendation for death. Majority op. at 19. I write separately to expand on the majority's Hurst analysis, specifically reviewing the mitigation presented at trial.

On direct appeal, we explained the mitigation evidence that the defense presented at the penalty phase of Cole's trial. Cole v. State, 36 So. 3d 597, 603 (Fla. 2010). Specifically, regarding mental health mitigation, Psychiatrist Dr. Earnest Miller "testified that Cole suffered from poly-substance and alcohol abuse, chronic depression, and a personality disorder not otherwise specified [and] . . . that Cole had witnessed abuse to family members and pets, had been sexually abused by her father, and had been in abusive relationships with two boyfriends." Id.

As the majority states, the jury in Cole's trial recommended each sentence of death by a vote of nine to three. Majority op. at 7. The trial court found multiple

------

6. Hurst v. State, 202 So. 3d 40 (Fla. 2016), cert. denied, No. 16-998, 2017 WL 635999 (U.S. May 22, 2017).

- 20 -

aggravating factors, four statutory mitigating circumstances, and several nonstatutory mitigating circumstances, which the trial court grouped into six categories. As this Court detailed on direct appeal:

> The trial court assigned "some weight" to both the "no significant history of prior criminal activity" mitigating factor and the age at the time of the crime mitigating factor (Cole was twenty-three years old). With respect to the minor participant mitigating factor, the trial court's order states, "While this defendant might not have turned the spade onto the Sumners, this Court cannot say that her participation was relatively minor. Accordingly, this matter is afforded little weight." With respect to the "substantial domination" mitigating factor, after noting that there was "some evidence of this mitigator in the record"—i.e., the defendant's own testimony—the trial court concluded that "given the totality of the circumstances, the Court cannot afford this matter much weight." The trial court stated that "the evidence tends to indicate that [Cole] knew exactly what she was doing and participated without hesitation."
>     The trial court grouped the numerous nonstatutory mitigating factors into six categories. The six categories include: (1) Cole had minimal involvement in the criminal activity (some weight); (2) Cole had psychological circumstances that included lack of self-confidence, low self-esteem, and feelings of inadequacy (little weight); (3) Cole had been a model prisoner (some weight); (4) Cole's family history included growing up without a father, being raised by a working mother, caring for her brothers and terminally ill father, being a victim of domestic violence, having the capacity to form loving relationships, and having the love and support of her family (some weight); (5) Cole had substance abuse problems (little weight); and (6) Cole was of good character (some weight).

Cole, 36 So. 3d at 606; see majority op. at 8.

Despite the trial court's findings that there were sufficient aggravators to impose death, which outweighed the mitigators, this Court has no way of knowing whether the jury unanimously found that the aggravation was sufficient to impose

- 21 -

death, or that the aggravation outweighed the mitigation. Also, this Court struck the HAC aggravating factor on direct appeal, which must be considered in determining "the effect of any error on the jury's findings" after Hurst. Wood v. State, 209 So. 3d 1217, 1233 (Fla. 2017); see majority op. at 9. In light of the jury's vote of nine to three to recommend sentences of death in Cole's case, this Court cannot speculate why the three jurors, who voted to recommend sentences of life imprisonment, determined that death was not the appropriate punishment. Thus, I agree with the majority's conclusion that the Hurst error in Cole's case was not harmless beyond a reasonable doubt.

LAWSON, J., concurring specially.

See Okafor v. State, 42 Fla. L. Weekly S639, S641, 2017 WL 2481266, at *6 (Fla. June 8, 2017) (Lawson, J., concurring specially).

CANADY, J., concurring in part and dissenting in part.

I agree with the decision to affirm the denial of relief on Cole's guilt phase claims. But I disagree with the decision to vacate Cole's death sentences and to remand for a new penalty phase. As I have previously explained, Hurst v. Florida, 136 S. Ct. 616 (2016), should not be given retroactive effect. See Mosley v. State, 209 So. 3d 1248, 1285-91 (Fla. 2016) (Canady, J., concurring in part and dissenting in part). I would also reject Cole's other penalty phase claims. The postconviction court's denial of all relief should be affirmed.

POLSTON, J., concurs.

An Appeal from the Circuit Court in and for Duval County,
    Michael R. Weatherby, Judge - Case No. 162005CF010263DXXXMA

Wayne Fetzer Henderson, Saint Augustine, Florida,

    for Appellant

Pamela Jo Bondi, Attorney General, and Carolyn M. Snurkowski, Assistant
Deputy Attorney General, Tallahassee, Florida,

    for Appellee